## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## DAVENPORT DIVISION

UNITED STATES OF AMERICA,

        Plaintiff(s),

vs.

ANGELO PETER EFTHIMIATOS,

        Defendant(s).

No. Criminal No. 3: 13-cr-00015

MOTION TO VACATE
UNDER 28 U.S.C. §2255

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………..3

I.     JURISDICTION………………………………………………...12

II.    MY CONVICTION AND SENTENCE MUST BE
       VACATED BECAUSE IOWA WAS NOT THE
       PROPER VENUE IN THIS CASE………………………………13

III.   MY CONVICTION MUST BE VACATED DUE TO
       INEFFECTIVE ASSISTANCE OF COUNSEL………………...18

IV.    MY CONVICTION MUST BE VACATED AND MY
       INDICTMENT DISMISSED DUE TO SEVERAL
       VIOLATIONS OF THE SPEEDY TRIAL ACT AND
       MY RIGHT TO A SPEEDY TRIAL……………………………22

V.     MY CONVICTION MUST BE VACATED AS I WAS
       THE VICTIM OF AN UNLAWFUL DETENTION AND
       AN UNREASONABLE SEARCH AND SEIZURE…………….30

VI.    MY CONVICTION MUST BE VACATED AND MY
       INDICTMENT DISMISSED FOR GOVERNMENT
       MISCONDUCT THAT SHOULD "SHOCK THE
       CONSCIENCE" OF THIS COURT……………………………..52

VII.   LACK OF AN AGREEMENT MEANS THERE WAS NO
       CONSPIRACY IN THIS CASE…………………………………57

VIII.  FORFEITURES AND OTHER SENTENCING ERRORS……61

## 2255 PRELIMINARY STATEMENT

I, Angelo Efthimiatos (I, me, Angelo) submit this memorandum in support of my motion to vacate my conviction or reduce my sentence pursuant to 28 USC 2255. There are a number of constitutional reasons / issues for my conviction to be thrown out for government misconduct that "shocks the conscience" as described in *Rochin v California*, 342 U.S. 165 (1952) that will be described more in detail below. But if there was a crime here, I did not commit it. If there was a crime here, Venue certainly did not lie in the District of Iowa, since the only reason I landed in Iowa was because of an engine malfunction, and an engine malfunction does not provide the government with the opportunity to try me in a decidedly "distant and unfriendly forum" in violation of two constitutional provisions, miles from my family and friends that would have helped and supported me. On top of this, I was incarcerated the entire time during which I could not assist in my own defense; and I was subjected to court appointed counsel that was not just "ineffective" but grossly incompetent. I did not have access to a computer, current law books or a law library as I currently have now at USP Canaan and not locked down in a maximum security prison, where I was attacked and in fear for my life every day. I can now freely research and discover how my constitutional rights were so badly abused by incompetent and ineffective counsel on my side and corrupt, dishonest and overzealous law enforcement and prosecutors on the government's side. The government stole/seized my wife's car, two of my airplanes that I bought and repaired to resell, all of my cash and assets, destroyed my business, my livelihood, my reputation. In December 2014 the FAA had to have a "Kangaroo Court" hearing to deprive me of my license to "work". For what reason is the most powerful government on Earth doing all of these bad things to a good person? Because I offered to help my brother Michael Efthimiatos (herein after "Michael") move his personal property from

California to Connecticut. The Court who referred to me as a "con man" clearly bought my brother Michael's story hook, line and sinker. While I took an allegedly "Open Plea" where my attorney promised me that I could appeal all of my issues like venue and the deprivation of my constitutional rights, my brother Michael went to trial and basically lied about my involvement in **his scheme** and **his marijuana business**. My own father took the stand *and lied* that Michael's cash came from picking up rents at my father's buildings in Connecticut. Once again if there was a crime here, it was all Michael's and not mine and venue was and is only appropriate in Connecticut where he obviously planned to sell his marijuana. His cash deposits came from marijuana sales not rental income.  Although it was Michael's trial, it was my good name and reputation that was put through the ringer for 4 days; and this strategy worked for him.

Your Honor obviously believed all of their lies, and because you felt sorry for Michael, Your Honor gave him 24 months while you handed me 57 months, allowed the government to strip me and my wife and daughter of all of our worldly possessions. You even allowed the government to steal my disabled wife's new car that was bought by her, in her name and never used in any crime. Recently my wife's (Nancy) older car completely died and only through the extreme kindness and Christian charity of another inmate's family does my wife and special needs daughter have a car to get around with daily activities and visit me in prison.

My only involvement in this nightmare began when Michael told me that he was getting a divorce from his wife Shana and needed my help to move some stuff, his belongings from California to Connecticut where my family lives. I have no problem accepting the criticism that I was being naive and protective of Michael, I believed every word that he said. But to add insult to injury in this incredible nightmare that I have experienced, I now see for the first time the photos taken by law enforcement that were in a packet supplied by the FAA as discovery for my

4

"hearing" to strip me of my pilots license. I have included these photos for the Court's

convenience so Your Honor can see how you have been lied to by your own prosecutors and law

enforcement officials, who took an oath as officers of the court to uphold justice and the

Constitution.  They also conspired with the agents on this case to lie and forge documents to the

Court. Your Honor primarily based your decision on my Motion to Suppress on these

government exhibits that I have just seen for the first time. My wife and I both know these are

forged documents and have hired a well-known handwriting expert to verify that both of these

documents that you based your decision are in fact forged. Please also see the photo marked

"Exhibit B" by the FAA. I had only received this evidence from the FAA for their hearing in

December. You will see that the marijuana was enclosed in double-bagged plastic bags,

hermetically sealed so no air could get in or out and that they used Bounce dryer sheets between

each plastic layer to prevent any smell or scent of the marijuana from possibly ever escaping; and

those hermetically sealed bags with dryer sheets were locked in water tight duffel bags and a

suitcase aboard a sealed air-tight airplane. Now please see the photo marked "Exhibit A" where

you will see the plane was outside and notice the fully extended wind sock because the wind was

blowing over 50 miles per hour on that day.  Please see the middle left side of photo "Exhibit A".

Regardless of whether the dog was upwind or downwind of the aircraft, there is no way that any

animal could sniff anything in a sealed plastic bag in a locked airplane during 50 mile per hour

winds on a freezing cold day. Both the dog and the airplane were outside on the tarmac in the

bitter cold howling winds. It is common sense that whatever Ultro ("The Wonder Dog") sniffed

it was NOT in the airplane. It is more likely the dog wanted a treat or to play with his tennis ball.

(See Docket No.78 page 6) Like the rest of the evidence against me, it was either fabricated by

the government officials or just a pack of lies to begin with.

There are many other violations of the Constitution in my case that justify Your Honor granting my petition and vacating my conviction. For example, there was no search warrant in my case and certainly no search warrant affidavit attached to the warrant as required by law. See e.g. *Groh v Ramirez* 540 U.S. 551 (2004), Instead the local law enforcement unlawfully detained me at the airport for two hours until the federal agents could get out to the airport, denied my repeated requests for counsel, continued to coerce and question me for nine hours without counsel or reading me my Miranda rights. Instead the government agents forged my name on the Consent to Search Form, which I recently just saw and they also forged my name on the Miranda Warnings Form which I also never saw before and I certainly did not sign. Please see the copies of the two forms along with copies of my real signature as Exhibits AE 1, 2, 3 and 4.

Additionally, the government has me on video-tape refusing to let them search the airplane. They threatened to smash the side window of the airplane, which was not mine. So to avoid the threatened damage I unlocked the plane, which did not belong to me, but only after they had to give me back the keys to the plane that they held all afternoon. And once again I looked into the camera and stated that I was not giving them permission to search the plane. But despite the allegedly "positive hit" by Ultro the government agents waited over five hours to conduct the search never bothering to get a search warrant. But they felt that they needed to forge a "permission to search" form? So I can only imagine that they knew that the search of the plane was illegal and that I had not given my permission. As Your Honor knows, the plane belongs to Jack Cooper, Aviation Direct C.S. so there is a question as to whether or not I could have legally even given any such permission to search someone else's plane. But it is clear from the video and audio taken during the illegal stop and detention of the plane and me that I never gave permission to have the plane searched and that must be the case because the government needed

to forge my signature after the fact on forms that I never saw until all of my legal papers were shipped to me here at USP Canaan in Waymart, Pennsylvania. I also did not sign the Miranda Rights Form (see attached exhibits AE.2,3 and 4). They are both forged documents and they were the two forged documents on which the Court based its erroneous and misapprehended conclusion that I gave my permission to search the plane whereas Your Honor makes the point that I knew what I was doing and had previously refused the search twice before. Since there is no search warrant and no search warrant affidavit attached as required by law see e.g. *Groh v Ramirez* the search and seizure of Mr. Cooper's plane was per se an unlawful search and seizure. See *Kyllo v United States,* 533 U.S. 27, 31 (2001) and *Illinois v Gates,* 462 U.S. 213(1983).

There was no probable cause here for the stop, my detention and the search of Mr. Cooper's plane or for a valid search warrant. As the Court's own opinion states (Doc. 78 at 1-2 FACTS) the AMOC was tracking my plane from 1:00am but they waited until the next day to find out my name and aircraft tail number? This is a totally frivolous canard of the government that I used "gift cards" to disguise my identity, which was a fact not even discovered until over three days later. The reason this is a baseless argument is that they called the airport manager who I registered with when I landed and parked the plane there and the airport manager readily gave my name, license number and my plane's tail number. The reason I was using gift cards to refuel was not to hide my identity but because my brother Michael had purchased the gift cards for me because I don't have any personal credit cards and I was doing a favor for him flying back to Connecticut what I thought were his personal belongings in duffel bags and a suitcase. Moreover if there was probable cause that I was doing anything wrong the FAA would have ordered me to land at any time from Livermore, California to Greeley, Colorado where I refueled, to Imperial, Nebraska where I had an hour and a half downtime for a bathroom break.

7

In this day and age when you are being tracked by the AMOC and Homeland Security, if you do not immediately respond to an order by the FAA to land at the nearest airport you can bet that there will soon be an F-16 fighter jet on your tail ordering you to land. The "Keystone Cops" routine described by the government of how Homeland Security and AMOC kept missing me by an hour or two is not just comical, it is clearly a deliberate attempt to insult Your Honor's intelligence. Ask anyone at Homeland Security what happens to a small plane that violates airspace or an order to land in this post 9-11 world. I was in constant contact with air traffic control. There was never a radio call for me to land. Homeland Security had over eight hours to alert the appropriate authorities to have someone order me to land. They did not use that time to get a search warrant nor did they alert the FAA of their suspicions since the only reason my plane had to do an emergency landing in Iowa was because of an engine malfunction. There were no exigent circumstances to allow a search of the plane without a warrant.

The search and seizure in Iowa was clearly an unlawful stop, search and seizure. A warrantless search has happened here and is a per se violation of the Constitution and is deemed to be an unlawful search and seizure. See e.g. *Kyllo v. United States*, 533 U.S. 27, 40 (2001). Also the Fourth Amendment is meant to protect "people not places" See Justice Harlan's opinion in *United States v. Katz*, 389 US 347 (1967). Moreover, this situation is very similar to the footlocker in the Supreme Court's decision in *United States v. Chadwick*, 433 U.S. 1 (1977) where the authorities were allegedly tracking a footlocker across the country from San Diego, California to Boston, Massachusetts travelling in a train. When the two "suspicious" looking individuals arrived in Boston with their footlocker they were arrested when they were trying to load the footlocker into Chadwick's car. The police arrested all three and took them to the Boston Federal Building where after only an hour of being under arrest the footlocker was opened to

reveal a substantial amount of marijuana. In a unanimous decision as to the illegality of the search and seizure of the footlocker without a warrant, the Supreme Court reiterated its decision in *Katz* that the Fourth Amendment protects the privacy interests of people and not places. All of the justices agreed it was wrong for the government to bring this appeal. The arrest was unlawful, the search and seizure was unlawful and the statements made by the defendants were all suppressed by the District Court and the Appeals Court as well.

But, in Justice Brennan's concurring opinion in *Chadwick*, he castigates the government for allowing this course of action and bringing the appeal on such an extreme view of the Fourth Amendment rather than protecting the constitutional rights and freedoms of the Citizens of the United States of America. Just as in *Chadwick*, there was an illegal surveillance; there was an illegal stop, followed by an illegal detention, an illegal arrest and an illegal search and seizure. The big difference between my case and in *Chadwick* was that the defendants in *Chadwick* were arrested first and then after an hour later the footlocker was opened. In my case I was detained at 11am in the morning, Ultro supposedly alerted at 12:35PM, I allegedly signed the Permission to Search form at 4:20PM and the threat to smash the window of the airplane was at 6:30PM. Why did they need to threaten me by smashing the window if I already gave them my written consent to search the plane at 4:20PM? The plane was searched at 7PM despite my refusal to allow the plane to be searched, and I was then officially arrested at 7:30PM. There was no search warrant or exigent circumstances for the unlawful search at 7PM. Therefore the unlawful search was not due to my arrest (see Docket No. 78 at page 28), which came later.

Furthermore, because no permission was given to search the plane by me or anyone else and because the act by the government officials to actually forge my signature on both the Miranda Warning Form and the Customs Permission to Search Form, should "shock the

conscious" of the Court and require the Court, in the interests of justice to order my immediate release from prison, to vacate my conviction and to dismiss my indictment with prejudice due to violations of my Fourth, Fifth and Sixth Amendment rights and for egregious government misconduct. The evidence of the government's egregious misconduct in my case is clear because if Ultro the "Sniff Dog" had really made a positive hit, the government would not have waited six hours to again ask my permission to enter the plane. The government's own video tape shows me refusing to allow the government to search the plane six hours after the "alert". They had the keys to the plane the entire time. They had to hand the keys back to me and ask me to open the plane because they threatened to smash the window. Why in the world would the government need to smash the windows of the plane if they had the keys to it? Or if they had probable cause to search the plane pursuant to an arrest or a valid warrant or Ultro's alert at 12:35PM? Or if I had really signed the Permission to Search Form at 4:20? Obviously this was another intimidation tactic. In retrospect I wish I had let them smash the window of the plane because Mr. Cooper lied through his teeth at my forfeiture hearing, and then there would be actual proof that I did not sign either of the forms and Ultro did not have a positive alert.

So the entire time from the alleged positive alert by Ultro to the threat to smash the window the government had the keys to this plane and could have opened the aircraft door as easily as opening the door to an automobile or a residence. Why didn't they open the door and search after six hours? Why did they threaten to break into the airplane window to which they held the keys? But most importantly why did they feel the need to forge my name on documents that I never saw until almost two years later when the FAA sent me the forms recently? Clearly law enforcement officers knew they did not read me my Miranda Rights (properly) and even Your Honor agreed that I was not read my rights properly or allowed to talk to an attorney

despite my repeated requests to have counsel present. So the government needed to forge my signature on a form that said that I was read my rights and waived my rights, neither of which was true, on a form that I never saw until recently. Additionally, after waiting six hours after the dog allegedly gave the positive alert they (apparently) felt they needed to threaten to break the window to an airplane to which they already had the keys. Then they needed to forge a document that (again) I never saw before, because they knew that I was on the government video tape and that I was clearly refusing to give my permission to search the aircraft. They knew they did not have a search warrant and/or probable cause and they also probably knew that there was no way that the dog could sniff anything outside of a sealed air-tight airplane with sealed bags inside and 50 M.P.H. winds howling outside. Could the lack of search warrant explain the 6 hour delay? Could it be they needed to make up the frivolous story of using "gift cards" three days later because they knew there was no probable cause for tracking my plane across the country?

Finally could it be that law enforcement needed to forge my "permission to search" three days or three months after the fact when someone told them that it would be impossible for any dog, even Ultro, to make a positive identification of hermitically sealed bags with Bounce dryer sheets in a locked and sealed aircraft outside on a tarmac outside in 50 M.P.H. freezing cold, howling winds. Just as random searches of a tourist's luggage have been thrown out as unreliable and therefore unreasonable, so too, must the search here be thrown out as there was no probable cause, no search warrant, no exigent circumstances and no permission given for the search. Please see my real signature on the documents attached to see that the Permission to Search and Miranda Forms were clearly forged. (Exhibit AE.1,2,3 and 4).

For the above reasons and for the detailed discussion contained below, I respectfully ask Your Honor to grant my 2255 Petition, vacate my conviction, order my immediate release from prison, and then dismiss my indictment with prejudice.

## I. Jurisdiction

Under Title 28 United States Code Section 2255 a person in custody under sentence of a court established by an Act of Congress is permitted to move the court which imposed sentence to vacate, set aside, or reduce that sentence on the grounds that the sentence imposed was in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack. 28 U.S.C. §2255.

On June 19, 2014 I was sentenced by this court to 57 months of incarceration. I am currently in the custody of the Bureau of Prisons at FPC Canaan in Waymart, Pennsylvania. I have steadfastly proclaimed my innocence of any wrongdoing in this matter and from the very beginning with both of my court appointed attorneys, I have argued that if there was a crime here, venue was not appropriate in the District of Iowa. Additionally, not only am I the victim of egregious government misconduct that should "shock the conscious" of this Court including the forging of my signature on documents allegedly giving my permission to search the plane in violation of my Fourth Amendment rights, I am also the victim of incompetent and ineffective assistance of counsel.

Since I have been told that claims of ineffective assistance of counsel must be first raised with the trial court rather than on appeal, and since I am currently incarcerated due to this Court's sentence, the claims raised below are properly made to this Court in the first instance and this

Court has jurisdiction to hear this timely-made motion to vacate my conviction and sentence pursuant to 28 USC 2255.

## II.   MY CONVICTION MUST BE VACATED AND INDICTMENT MUST BE DISMISSED AS IOWA WAS NOT THE PROPER VENUE FOR EITHER OF THE COUNTS.

It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. See *U.S. Const. Art* III, Sec. 2, cl. 3 ("The trial of all crimes... shall be held in the state where the said crimes shall have been committed..."); Amend. VI (Requiring trial of a criminal case "By an impartial jury of the state and district where the crime shall have been committed.").

Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "A District in which the offense was committed." Fed.R.Crim. P. 18. This rule "Echoes the Constitutional Commands." See *United States v. Cabrales*, 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to me in this case because of my emergency "crash-landing" in Iowa; as graphically depicted by the government in their opposition brief. Seen in this light, it is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system. See *United States v. Johnson*, 323 U.S. 273, 276 (1944). In the instant matter, venue in Iowa was improper as I am not now nor had I ever have been a resident of Iowa. I had never even visited Iowa before my emergency landing. The government has alleged no overt criminal acts by myself with any connection to the State of Iowa in the indictment.

13

In *Cabrales*, an Eighth Circuit decision unanimously affirmed by the Supreme Court, Vicki Cabrales lived and worked in Missouri and was a resident of Missouri and was even a drug dealer in Missouri, but venue still was not appropriate for her trial based on money-laundering charges, because the money-laundering that she was accused of all happened in Florida. If Missouri was not the appropriate forum to try Vicki Cabrales for a crime, then Iowa certainly cannot be the appropriate forum to try me, because until my emergency landing in Iowa, I had never been there before.

Because it is indisputable that I did not perform any "essential conduct element" of the crime charged and alleged in the indictment in the District of Iowa, my 2255 petition should be granted and my conviction must be reversed and vacated. See *United States v. Auernheimer*, Crim. No. 11-cr-470 (3d Cir. April 11, 2014). As explained in *Auernheimer*, these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. As explained by the First Circuit: "Venue in a criminal case is not an arcane technicality. It involves matters that touch closely the fair administration of criminal justice and public confidence in it. The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim". See *United States v. Salinas*, 373 F. 3d 161, 162, 164 (1st Cir. 2004). Under the standard set in *Cabrales*, *Salinas*, and *Auernheimer*, I committed no crime triable in an Iowa court.

Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution requires that a person be tried for an offense "In the District where that offense was committed". Fed.R.Crim. P.18.   Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article III, and the Sixth Amendment. See *United States v. Anderson*, 328 U.S. 699, 703 (1946) ("The locus delicti must be determined from the nature of the crime alleged and

the location of the act or acts constituting it.") these congressional and constitutional protections are meant to provide a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum. See *United States v. Salinas,* 373 F.3d 161 (1st Cir. 2004). Unfortunately this is exactly what has happened to me in this case. In a criminal case "venue must be narrowly construed" *See United States v Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). "Venue is an element which must be proved by preponderance of the evidence." See *United States v. Miller*, 111 F.3d 747, 749-50 (10th Cir. 1997). It is indisputable that I did not perform any "essential conduct element" of the crime charged and alleged in the indictment in the District of Iowa.

As with a lack of subject matter jurisdiction, improper venue requires dismissal of the indictment or a judgment of acquittal. See *United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) (Remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "Does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, See *Salinas* at 163, but the government must also allege sufficient facts in the indictment to establish proper venue *ab initio*.

The alleged facts in this matter are very similar to those presented in *Salinas*, in that any alleged criminal conduct by me did not occur in Iowa. I only landed in Iowa due to engine failure. The defendant in *Salinas* was prosecuted for passport fraud not in New York, where the defendant applied for the passport at the post office, but in New Hampshire, where the fraud was discovered by the passport office. The court dismissed the indictment for lack of venue finding that all of the criminal conduct, the elements of the offense, occurred in New York. *Id.* at 165-170.

15

When an indictment charges a defendant with more than one count, "venue must be proper with respect to each count." *Travis v. United States* 364 U.S. 631 (1961). "Where Congress is not explicit, the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Travis* at 635, moreover, the Supreme Court has repeatedly construed a necessary connection between venue and the conduct elements of an offense. See e.g. *Cabrales*. This connection between venue and the elements of an offense means that a **criminal defendant's own actions will determine where venue can be laid.**

In this case, even if it was true, which it is not, that I was in a conspiracy to possess or distribute marijuana, there were no marijuana sales ever contemplated by my brother Michael in Iowa. My emergency landing in Iowa was purely by accident, and there was no criminal conduct associated with my "hard landing" as portrayed in the government briefs in the forfeiture issues in this case. Moreover, the government was allegedly tracking me all across the country and knows that I *PURPOSEFULLY* landed in Greeley, Colorado to refuel and in Imperial, Nebraska to use the bathroom. Under the government's theory of venue I could theoretically be prosecuted for Michael's marijuana distribution anywhere from California to Connecticut and anywhere that I had to take a bathroom break or crash-landed. Under the government's theory of venue, Dorothy could be tried in Oz for marijuana possession and distribution just because her house from Kansas happened to land there. Not only is that illogical, it offends traditional notions of the importance that the Founders put in venue in the Constitution and that no one should be tried in a remote or "unfriendly" forum whether it be in England or in Iowa. The government's theory of venue anywhere the plane lands is also at odds with *Cabrales* which is an Eighth Circuit opinion affirmed by a unanimous Supreme Court. While Vicki Cabrales might have been a "drug dealer" in Missouri, she was only a "money launderer" in Florida and could not be tried in

Missouri for a crime that was allegedly committed only in Florida. Similarly in my case, even assuming that I knew there was marijuana in Michael's suitcase and duffel bags, which I did not, any "conspiracy" to sell the drugs, would have been properly venued only in Connecticut where Michael planned to sell his drugs. That means I should have been tried - if at all - in Connecticut and the Second Circuit, not Iowa, a place I had never been before, far from family and friends, and certainly not in the Eighth Circuit where *Cabrales* is the established precedent.

As for the Second Circuit, it is remarkably similar to the law of the Eighth Circuit and actually cites to *Cabrales* when it says that "Venue is proper only where the acts constituting the offense - the crime's essential conduct elements - took place." *United States v. Tzolov,* 642 F.3d 214, 218 (2d Cir. 2011) (dismissing fraud claim brought in the EDNY (Brooklyn) instead of the SDNY (Manhattan), literally one subway stop away in New York City). The Second Circuit, where I should have been tried, if I was tried at all, has enumerated four factors used to determine whether venue is constitutionally permissible:

(1) The site of the defendant's acts;

(2) The elements and nature of the crime;

(3) The locus of the effect of the alleged criminal conduct; and,

(4) The suitability of the district for accurate fact finding. *United States v. Reed,* 773 F.2d 447, 481 (2d Cir. 1985); See also *United States v. Beech-Nut nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir. 1989).

In *Tzolov,* the government sought to claim venue was appropriate for an investment banker who worked in Manhattan in the Eastern District of New York simply because he flew out of JFK Airport on his trips to Europe, where he allegedly defrauded certain European investors on certain types of bonds. The Second Circuit clearly thought there was no "criminal

act" in flying out of JFK and that was not an element of the alleged criminal conduct. Similarly a "crash landing" or emergency landing in Iowa clearly does not establish venue in Iowa because no one - not even Michael - contemplated selling marijuana in Iowa. The Second Circuit concluded that *Tzolov* did not have any "substantial contact" with the EDNY to warrant a trial there. Similarly, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), another case just one subway stop away, the defendant challenged jurisdiction in the EDNY when all the evidence showed (and the government had to concede) that the alleged offenses all actually took place in Manhattan, the Southern District of New York (SDNY). If Brooklyn was a "distant, remote, and unfriendly forum" from Manhattan for *Tzolov* and *Novak*, imagine how I feel being a Connecticut Yankee trapped in an Iowa court. See *Salinas*, 164.

Therefore, based on the issues discussed above Your Honor should grant my 2255 Petition, vacate my conviction, order my immediate release from prison and then dismiss my indictment with prejudice because Iowa was not the proper venue for me to be tried on any crime.

## III. MOTION TO VACATE CONVICTION AND SENTENCE DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL

In *Hinton v. Alabama*, 571 U.S. __, 134 S. Ct. 1081 (2014), the Supreme Court relied on the now familiar *Strickland v. Washington*, 466 U.S. 688 (1984) two-prong test, which was created for judging the ineffectiveness of counsel. "Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel." *Padilla v. Kentucky*, 130 U.S. 1473, 1480-81 (2010), quoting *McMann v. Richardson*, 397 U.S. 739, 771 (1970), and *Strickland*, 466 U.S. at 686. The Supreme Court has determined that "ineffective assistance under Strickland" is deficient performance by counsel resulting in prejudice, with performance being measured against an "objective standard of reasonableness, under prevailing professional

norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005).  As detailed again below, it is by now well-established law that counsel's failure to conduct an adequate investigation into potential defenses or to research case law that may result in a lower sentence, even in taking a guilty plea, can constitute the ineffective assistance of counsel. The two-part Strickland test also "applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Under *Strickland*, the Court "first determines whether counsel's representation fell below an objective standard of reasonableness." *Padilla*, 130 U.S. at 1480, *quoting Strickland*, 566 U.S. at 688. The Court then asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  There can be no doubt that describes exactly what happened in my case.

In terms of a guilty plea, the second prong of the *Strickland* inquiry is whether a "reasonable probability" exists that, but for counsel's ineffectiveness or deficiency, the defendant would not have pleaded guilty, but instead would have proceeded to trial. See *Lockhart*, 474 U.S. at 370 ("The second prong, or prejudice requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").  In my case, I was planning to go to trial until Attorney Helphrey abandoned me at the eleventh hour base on an alleged, "actual conflict of interest".

The Eight Circuit has said that: "Counsel fails to render the constitutionally required level of effective assistance when he does not exercise the customary skills and diligence that a reasonable competent attorney would perform under similar circumstances. See *Ford v. Parrat*,

638 F.2d 1117 (8th Cir. 1981). The Supreme Court also said that: "A guilty plea is open to attack on the ground that counsel did not provide the defendant with reasonably competent advice." See *Cuyler v. Sullivan,* 466 U.S. 335, 344 (1980). And because attorney Diane Helphrey abandoned me at a critical time in the case, literally two weeks before I had to decide to go to trial or take a plea, for what was obviously a spurious, "conflict of interest" claim for someone else she was representing, I now only need to show her obvious deficient performance to make my claim to vacate my convictions because under these circumstances the Supreme Court says that "prejudice" in such a case involving a "conflict of interest" is presumed. See, e.g., *Glasser v. United States,* 315 U.S. 60, 70 (1942), and *Holloway v. Arkansas,* 435 U.S. 475, 484 (1978). See also *Chapman v. California,* 386 U.S. 18, 23 (1967) that "claims of ineffectiveness assistance of counsel" are never to be treated as harmless error.

The Second Circuit has said that "the very product of the alleged ineffectiveness, (i.e. the plea agreement and waiver), cannot fairly be used to bar a claim of Ineffective Assistance of Counsel." *United States v. Hernandez,* 242 F.3d 110, 114 (2d Cir. 2001) (citing *United States v. Djelevic,* 161 F.3d 104 (2d Cir. 1998)). This is exactly the sort of conduct this Court should not countenance on the part of the government to block my legitimate Constitutional claims. In discharging the constitutionally ineffective assistance of counsel, defense counsel has an obligation to conduct a reasonable investigation into the government's allegations and conduct in this case and should have presented my claims for lack of Venue, Speedy Trial, government misconduct, and Unreasonable Search and Seizure. Attorney Helphrey did none of these things. Instead she manufactured a "conflict of interest" claim so she could abandon my defense at its most critical juncture. See DKT. Nos. 84 and 85 for Attorney Helphrey's Motion to Withdraw for a conflict of interest which was acknowledged and granted by this Court.

20

Because I need only show the first of *Strickland's* two prongs because of the presumed prejudice of a conflict of interest, this Court should grant my 2255 petition and vacate my conviction.  The Supreme Court has ruled that even a guilty plea can be challenged based on the ineffective assistance of counsel, see e.g. *McCann v. Richardson,* 397 U.S. 759, 771 (1970) and *Padilla* at 1481, and especially if the guilty plea was not intelligently or voluntarily given based on bad advice of counsel, see e.g. *Tollett v. Henderson,* 411 U.S. 258 (1973)(where the attorney did not advise defendant of all of the ramifications of taking a guilty plea). Especially in my case where Attorney Helphrey actually lied to me and my wife saying that if I took an "open plea" that all of my issues such as Venue, Speedy Trial and Unreasonable Search and Seizure would be preserved, imagine how I felt when I arrived at Canaan prison to have my fellow inmates tell me that there is no such thing as an "open plea" and my new court appointed attorney confirmed that by taking a plea I effectively wiped out all of my pre-trial claims and defenses. That, I certainly did not mean to do.  Therefore, because I was lied to by my court appointed attorney, Diane Helphrey, then abandoned by her at a critical juncture in my case due to an actual "conflict of interest" that this Court acknowledged and confirmed by letting her withdraw, I am entitled to a ruling by Your Honor that I was presumptively prejudiced and my attorney offered ineffective assistance of counsel per se as was decided in *Holloway,* based on *Glasser,* and as recited by the Supreme Court in *Cuyler v. Sullivan,* 446 U.S. 335, 347 (1980). While I certainly satisfy both prongs of *Strickland,* this Court should have no problem ruling that I was a victim of constitutionally defective and deficient assistance of counsel and was clearly prejudice by that incompetent and deceitful performance by Attorney Helphrey. Recently the Kansas Supreme Court overturned the conviction of a defendant for ineffective assistance of counsel and had the attorney that represented him disbarred. See *State v. Cheatham,* 292 P.3d 318, 92 CrL 492 (Kan.

21

2013) the attorney in that case did a far better job for his client than Attorney Helphrey did for me. And, since she abandoned me at a importantly, crucial time and at a critical juncture in my case due to an "actual conflict of interest" as certified by this Court, I am entitled to presumed prejudice and my conviction must be vacated in accordance with longstanding Supreme Court precedents such as *Glasser, Holloway,* and *Cuyler.*

## IV. MY CONVICTION MUST BE VACATED AND MY INDICTMENT DISMISSED DUE TO SEVERAL VIOLATIONS OF THE SPEEDY TRIAL ACT AND MY RIGHT TO A SPEEDY TRIAL

My conviction must be overturned and my indictment dismissed due to not one but four separate violations of the Speedy Trial Act (STA) and the Speedy Trial Clock under 18 U.S.C. §3161. Moreover, because of my incarceration from the moment of my arrest on February 19, 2013 there is a further violation of §3161 in that my indictment was sealed and not even mentioned on the Docket until after March 21, 2013 (See DKT. No. 13), and my arraignment was not until March 29, 2013 (See DKT. Nos. 14-15), thereby violating the 30-day rule for arraignments within 30 days of arrest as required by law. See §3161(b). But, since the four STA Clock violations in my case are all readily apparent from a review of the Docket in my case, and all are substantially longer than the violations in *United States v. Bloate,*559 U.S. 196 (2010), and *United States v. Tinklenberg,* 131 S.Ct. 2007 (2011), and *Bloate* upon remand to the 8th Circuit (*United States v. Bloate,* 655 F.3d 750 (8th Cir. 2011)), this Honorable Court should immediately grant my 2255 Petition, order my immediate release from prison, vacate my conviction and sentence, and dismiss my indictment as required by 18 U.S.C. §3162.

The first of the four separate STA Clock violations begins with Dkt. No. 1 dated February 20, 2013 with my arrest and initial appearance. As stated in the Docket, the sealed indictment was docketed on March 21, 2013 and the arraignment was March 29, 2013, more than

30 days after February 19th, setting a jury trial for June 3, 2013 that never happened. As of the

arraignment (Dkt. No. 15) on March 29, 2013, 37 non-excludable days had already passed. Then

there is nothing else on the Docket until May 7, 2013 with Dkt. No. 16 which is an order setting

a pretrial conference. Another 39 days of non-excludable time had elapsed between March 29,

2013 and May 7, 2013, resulting in a total of 76 non-excludable days for my first STA Clock

violation under both *Bloate* and *Tinklenberg*. As the defendant in this case, I have no obligation

or duty to bring myself to trial. See, e.g., *Barker v. Wingo,* 407 U.S. 514, 527 (1972). And since I

was incarcerated the entire time that the government was ignoring my rights to a Speedy Trial, I

suffered all of the worst fears the Founders imagined:

> "To legally arrest and detain, the Government must assert probable cause to believe the
> arrestee has committed a crime. Arrest is a public act that may seriously interfere with
> the defendant's liberty, whether he is free on bail or not, and that may disrupt his
> employment, drain his financial resources, curtail his associations, subject him to public
> obloquy, and create anxiety in him, his family and his friends" See *United States v.*
> *Marion,* 404 U.S. 307, 320 (1971).

Additionally, as the Supreme Court stated in *United States v. Loud Hawk*:

> "We have discussed previously the societal disadvantages of lengthy pretrial
> incarceration, but <u>obviously</u> the disadvantages for the accused who cannot obtain his
> release are even more serious. The time spent in jail awaiting trial has a detrimental
> impact on the individual. It often means loss of a job; disrupts family life; and it enforces
> idleness. Most jails offer little or no recreational or rehabilitative programs. The time
> spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in
> his ability to gather evidence, contact witnesses, or otherwise prepare his defense.
> Imposing those consequences on anyone who has not yet been convicted is serious. It is
> especially unfortunate to impose them on those persons who are ultimately found to be
> innocent." *United States v. Loud Hawk,* 474 US. 302 (1986).

Then, starting again with Dkt. No. 19 dated May 16, 2013, the Court ordered an "Ends of

Justice" continuance but without mentioning any specific dates to be excluded in the future. Even

more fatal to the government, is the fact that there was absolutely no reason or "ends of justice"

analysis as required by *Zedner v. United States,* 547 U.S. 489 (2006) put on the record itself as to

why this continuance was in the interests of justice. After *Zedner*, a court is not allowed to stop the STA Clock just by mouthing the words or giving lip service to the words, "Ends of Justice" to create excludable time.

Section 18 U.S.C. § 3161(h)(7)(A) provides that no delay resulting from a continuance granted by the court under that subsection "shall be excludable . . . unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial); See, e.g., *Zedner v. United States*, 547 U.S. 489, 506-07 (2006) (holding Speedy Trial Act violated where district court failed to make such findings); *United States v. Huete-Sandoval*, 668 F.3d 1, 3, 5 (1st Cir. 2011)(same). "Ends-of-justice" continuances "should not be granted cavalierly," and recorded to ensure that the district court has "seriously weigh[ed] the benefits of granting the continuance against the strong public and private interests served by speedy trials," *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008), and that ends-of-justice continuances are not used more widely than Congress intended:

> "The record, which includes the oral and written statements of both the district court and the moving party, must contain an explanation of why the mere occurance of the event identified by the party as necessitating the continuance results in the need for additional time...A record consisting only of short, conclusory statements lacking in detail is insufficient. For example it is insufficient to merely state that counsel is new and thus needs more time to adequately prepare for trial or that counsel of witnesses will be out of town in the weeks preceding the trial and therefore more time is required to prepare for trial...Simply identifying an event, and adding the conclusory statement that the event requires more time for counsel to prepare is not enough". *United States v. Toombs*, 574 F.3d 1262, 1271-72 (10th Cir. 2009).

"[I]f a judge fails to make the requisite findings regarding the need for an ends-of-justice continuance, the delay resulting from the continuance must be counted . . . " *United States v. Larson,* 627 F.3d 1198, 1204 (10th Cir. 2010), quoting *Zedner*, 547 U.S. at 508. See e.g., *Bryant*, 523 F.3d at 361 (*Zedner* "placed special emphasis on what it called the procedural strictness of

the STA . . . and in particular on the trial judge's obligation to make findings that give due

consideration to the weighty interests in favor of a speedy trial that the Speedy Trial Act was

mean to embody"); *United States v. Valdivia*, 680 F.3d 33, 40 (1st Cir. 2012)(district court "must

articulate clearly the reasons that support an ends-of justice continuance").

     Here, at the time it granted the continuance, the Court made no Speedy Trial findings

whatsoever, instead simply stating that the time would be excluded. Although the Supreme Court

indicated in *Zedner* that the district court's findings could be entered on the record as late as the

time at which it ruled on the defendant's motion to dismiss on speedy trial grounds, it

emphasized that the findings must have been "made, if only in the judge's mind, before granting

the continuance." 547 U.S. at 506-07 (emphasis added). See, e.g., *Larson*, 627 F.3d at 1204

("These findings may be entered on the record after the fact, but they may not be made after the

fact" (emphasis in original)): *United States v. Crawford*, 982 F.2d 199, 204 (6th Cir. 1993)("The

reasons states must be the actual reasons that motivated the court at the time the continuance was

granted"); *Keith*, 42 F.3d at 237 (district court may not grant ends-of-justice continuance nunc

pro tunc). It must be "clear from the record that the court conducted the mandatory balancing

contemporaneously with the granting of the continuance." *United States v. Henry*, 538 F.3d 300,

304 (4th Cir. 2008). See, e.g., *Toombs*, 574 F.3d at 1269 ("[T]he record must clearly establish

[that] the district court considered the proper factors at the time such a continuance was

granted").

     The reason this is significant, is because once again there is absolutely nothing on the

docket between May 16, 2013 (Dkt. No. 19) and July 15, 2013 (Dkt. No. 20) which is yet

another set of 60 non-excludable days in and of itself, when that delay of 60 non-excludable days

is added to the nine days between May 7, 2013 (Dkt. No. 16) and May 16, 2013 (Dkt. No. 19)

25

and the two days between July 15, 2013 (Dkt. No. 20) and July 17, 2013 (Dkt. No. 22), the result is yet another STA Clock violation of 71 days under *Bloate* and *Tinklenberg*.

Once again, these two STA Clock violations are made even more heinous and unconstitutional because I was incarcerated the entire time in an "unfriendly forum" far from my family and friends; and I was the victim of ineffective and incompetent counsel who should have immediately seen that I was the victim of not one but several Speedy Trial violations. Instead, I learned about my constitutional rights to a Speedy Trial and 18 U.S.C. §3161 by sitting in a bunk in a prison talking to other inmates. This is not how justice or the Constitutional rights of an individual citizen should be handled in a court of law in America.

The third STA Clock violation begins where the second one ended with Dkt. No. 22 on July 17, 2013 and goes to the Dkt. No. 36 where a new sealed superseding indictment is filed by the government on August 22, 2013. But, there is nothing that would stop the STA Clock for the 37 non-excludable days between July 17, 2013 and August 22, 2013. There is another six days that run off the STA Clock to Dkt. No. 41 with the arraignment on the superseding indictment and the new trial date set for November 4, 2013. Then once again, there is nothing that stops the STA Clock for an additional 28 days between August 28, 2013 and September 25, 2013 with the appointment of counsel under Dkt. No. 73. That is yet another STA Clock violation under section 3161 of 71 non-excludable days.

The fourth of the four separate STA Clock violations starts with Dkt. No. 73, and the re-appointment of attorney Diane Helphrey as my counsel on September 25, 2013. Despite the fact that I have now been incarcerated for over seven months with court appointed counsel, it apparently never dawned on Attorney Helphrey to even take a cursory glance at my Docket Sheet to see if there were any potential Speedy Trial violations - much less three separate

violations under the STA and Section 3161. I just want Your Honor to know that no less than a dozen inmates have sat with me and reviewed my case - and despite the fact that none of them are practicing attorneys, or went to law school like Attorney Helphrey they ALL immediately picked up on the fact that there were clearly several, and not just one, but four STA Clock violations. And even if there is just one STA Clock violation and it only for ONE DAY this court should grant my 2255 petition, vacate my convictions, and dismiss my indictment as the Eighth Circuit did in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996), where the Eighth Circuit reversed a conviction and dismissed the indictment for only one STA Clock violation of only one day - 71 days of non-excludable time had elapsed. See also a major reversal by the First Circuit after reading the Supreme Court's decision in *Bloate* for only one STA Clock violation of merely 16 days. In *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) where the First Circuit overturned its own prior decisions which were in conflict with *Bloate* on what pre-trial notions actually stop the STA Clock. Please also see the 8th Circuit excellent analysis of the STA Clock in *United States v. Bloate*, 655 F.3d 750 (8th Cir. 2011) upon remand from the Supreme Court.

This is important because the only motion that would remotely stop the STA Clock would be the Motion to Suppress and under *United States v. Henderson*, 476 U.S. 321 (1986), the total amount of time that a pre-trial motion stops the clock for is 30 days. See *Henderson* 476 U.S. at 330. Even assuming arguendo that the STA clock did stop for that one motion, which it clearly did not, there are still 4 clear violations in this case of more than 70 days, and another 36 days on top of that. So starting the fourth violation with the "re-appointment" of Attorney Helphrey, who had been my appointed counsel since February of 2013, on September 25, 2013 at Dkt. No. 73, there is a five day delay in the filing of a brief on September 30, 2013 at Dkt. No. 74, and another delay of eight days for the order granting in part leading up to another 20 day

delay until October 28, 2013 then the Court issues yet another "Ends of Justice" continuance without the *Zedner* required analysis at Dkt. No. 83.

Because an "Ends of Justice" continuation does not stop the STA Clock without the *Zedner* balancing and required examination of the facts and circumstances requiring the continuance in the interest of justice, another 14 days of non-excludable time runs off the STA Clock between October 28, 2013 and November 12, 2013 when Attorney Helphrey manufacturers a totally bogus claim of "conflict of interest" with another of her clients that I never talked to much less conspired with, in order to withdraw as my counsel at Dkt. No. 84. Then Dkt. No. 86 is the appointment of new counsel for me, on November 24th, taking another two days off the STA Clock. Then, as should be expected by now, another 22 days rolls off the STA Clock with no activity between November 14, 2013 and Dkt. No. 88 on December 5, 2013 involving my detention hearing proceedings and Dkt. No. 89 of December 6, 2013, involving stipulating discovery between the parties, which results in the fourth STA Clock violation of 71 days or more.

My new attorney, John Lane also did not review my Docket or pick up the Speedy Trial violations but I believe he was panicking because the Court had set a deadline for me to take a plea or go to trial. Attorney Helphrey who betrayed me and abandoned me at a crucial time also gave me the ludicrous and grossly erroneous advice that I was taking an "open plea" and preserving all of my appellate issues and my rights to challenge Venue and the Speedy Trial violations and my unlawful search and seizure. Attorney Lane has advised me that is all "Poppy Cock" and there is no such thing as an "open plea" despite Attorney Helphrey putting that in some of her letters. See attached letter from Attorney Helphrey.

In fact Attorney Helphrey never responded to any of my requests for help or objections to Venue in Iowa and she was downright rude to my wife who was questioning Attorney Helphrey's lack of loyalty to me, as her client. So not only did Attorney Helphrey miss four clear and obvious violations of the STA Clock she gave me terrible advice about taking an "open plea" which does not exist in the law and abandoned me for no good reason before an important court imposed deadline. For what Attorney Helphrey did to me she should be sanctioned and disbarred as the Kansas Supreme Court did to an attorney for the failure to adequately defend a client in a criminal case see *Kansas v. Cheatham*, 292 p.3d 318,92 CrL 492 (Kan. 2013).

Finally, there is another 15 days to December 20, 2013 where Attorney Lane advised me to change my plea (Dkt. No. 98) because he has no way of preparing for trial in two weeks' time, and he believes the Court would be "reluctant" to grant yet another delay; and then another 21 days to January 10, 2014 with the acceptance of the plea under Dkt. No. 110. Neither Attorney Helphrey nor Attorney Lane noticed the four glaring STA violations in this case that a dozen "non-attorney" inmates had no problem seeing at first glance. This is significant because the leading case in America on the Speedy Trial Act is the Supreme Court's decision in *United States v. Bloate*, 559 U.S. 196 (2010), which reversed the Eighth Circuit's affirmation of the district court's denial of Bloate's Speedy Trial motion to dismiss. Bloate received a 30 year sentence that was ordered to be vacated and remanded back to the Eighth Circuit after the Supreme Court's reversal of their decision. See the Eighth Circuit's decision in *Bloate,* 655 F.3d at 750. The Eighth Circuit only had to examine two different 10 day periods to vacate Bloate's conviction and sentence. In my case, there are at least four separate violations of the STA, Clock and I only need one violation of one day to overturn my conviction. See *Bloate* at 755 and *Dezeler* at 89. See also the in-depth calculation of non-excludable days and STA Clock analysis in *United*

*States v. Suarez-Perez,* 484 F.3d 537 (8th Cir. 2006) where *Suarez-Perez* entered a conditional

plea of guilty and the Eighth Circuit reversed and vacated the defendant's conviction and

sentence and dismissed the indictment.

For this reason I ask this Honorable Court to please immediately grant my 2255 petition,

order my immediate release from prison, vacate my conviction and sentence and dismiss my

indictment with prejudice as required by 18 U.S.C. §3162.

## V.    MY CONVICTION MUST BE VACATED AS I WAS THE VICTIM OF AN UNLAWFUL DETENTION AND AN UNREASONABLE SEARCH AND SEIZURE

In many respects, my case is exactly like the situation the Supreme Court describes in its

virtually unanimous decision in *United States v. Chadwick,* 433 U.S. 1 (1977), where even the

dissent by Justice Blackmun was critical of the government bringing such an extreme view of the

Fourth Amendment (that people are secure only in their homes from an unlawful search and

seizure) to the Supreme Court (a legal theory that was unanimously rejected by the Supreme

Court). Not only did the Supreme Court rebuke the unlawful activities of the law enforcement

agents in *Chadwick* it gave the Court the opportunity to cite several times Justice Harlan's

famous quote that the "Fourth Amendment protects people not places," See *Chadwick* at 9-10

citing *United States v. Katz,* 389 U.S. 347, 351 (1967).

Rather than four duffle bags and a suitcase that had an unexpected emergency "hard

landing" in Iowa, *Chadwick* involves the government getting a tip to track two individuals and a

footlocker on a train from San Diego to Boston. The government agents in *Chadwick* waited

until the suspects took the footlocker to a waiting car, and then all three defendants were

arrested. They and the footlocker are taken to the Boston federal building where they are

detained and questioned despite having the suspects and the footlocker safely in their custody for

a couple of hours, no one thinks to get a search warrant, and instead they simply open the

footlocker and find the marijuana inside. The only difference between *Chadwick* and my case is

that train made it from California to the expected destination whereas I had an unanticipated

emergency landing in Iowa. There was no "tip" in my case or "suspicious activity" until it was

manufactured days and weeks after my unlawful stop.

The government tried to justify its unlawful search and seizure without a warrant in

*Chadwick* with two very weak and baseless arguments:

> 1) The Fourth Amendment only protects unreasonable searches and seizures in the four
>
> corners of a person's home; and,
>
> 2) The fact that they loaded the footlocker into a waiting car made the unlawful search
>
> and seizure a traffic stop case.

It is hard to decide which of these two baseless arguments made by the government in *Chadwick*

is worse. Suffice it to say that in *Chadwick* the district court ruled it was an unlawful search and

seizure and granted the motion to suppress, which was a affirmed by the First Circuit and then by

the Supreme Court. Just as the Supreme Court's decision in *Cabrales* was the leading case on

venue, so too is *Chadwick* the leading case on the "expectation of privacy" is protected

everywhere, and a double locked footlocker's privacy expectation is every bit as great as the

locked suitcase and duffle bags inside a locked airplane as was the situation in my case. Just as

the Fourth Amendment "protected people and not places" in *Chadwick* so too should I be

protected in my case by the same Constitution.

Just as in *Chadwick* where the footlocker and the defendants were detained at the federal

building in Boston so too was I detained at the airport and they had taken the keys to the airplane

from me, so there were no "exigent" circumstances of evidence being destroyed or me taking off

that might excuse applying for a search warrant. However, unlike in *Chadwick* where there was a "lawful arrest" and there was "probable cause" that the footlocker contained contraband there was no legal stop, arrest or detention in my case and there was no "tip" or "probable cause" that I was carrying any contraband or doing anything "suspicious" until the government made up suspicions days after the fact. Such as I used my brother Michael's gift cards to fill up with fuel and did not disclose my tail registration number when I filled up with fuel because that is not required.  I used the gift cards because I did not have a credit card of my own and gift cards are used in lieu of a credit card, neither of which activities are illegal, and if I really was carrying Michael's personal belongings as I thought that I was, I would have done the exact same thing.

In *Chadwick* however, AMTRAK officials observed the defendants loading the footlocker on the train and noticed that it appeared rather heavy for its size and was "leaking talcum powder a substance often used to mask the odor of marijuana or hashish". That is why the railroad officials notified federal agents in San Diego, California of their suspicions, who in turn alerted the federal officials in Boston, Massachusetts to be on the lookout for the two suspicious characters and their footlocker. In my case, it was not until many weeks after my arrest, that the government found airport camera footage of my brother Michael and they had my father identify me and my brother Michael, who was helping me load his bags on to the airplane. There was no "tip" or "suspicious activity" to give the agents in my case "probable cause" as the tip from the AMTRAK officials gave the federal agents in *Chadwick*.

Just as there was no reason or excuse for the warrantless search of the airplane especially after nine hours of detention, the Supreme Court states in *Chadwick*, the other reason that a search warrant and a search warrant application is important is because it gives the person being searched the reasons for the search and proof that the officials conducting the search have the

authority of a court to conduct a search. The Supreme Court also ruled that a number of cases they mention "reflect the settled Constitutional principal...that a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interest, and not simply those interests found inside the four walls of a home." *Chadwick* at 11 (extensive citations to other Supreme Court cases omitted).

Just as *Chadwick* stands for the proposition that the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy" *Chadwick* at 7, and *Katz* stands for the proposition that the "Fourth Amendment protects people not places" *Chadwick* at 11. See *Katz*, 389 U.S. at 351. There are other Supreme Court decisions directly on point to my case. For example, in *United States v. Place,* 462 U.S. 696 (1983), a passenger was suspected of carrying contraband in his suitcase on a flight from Miami to New York. Needless to say there were drugs in the suitcase when the suitcase was examined without a warrant. But the significance of *Place* to my case is that the detention and search were "unreasonable" in *Place* because he was detained for only 90 minutes and the agents in *Place* did not act diligently to minimize the delay of his detention. In my case, I was unlawfully detained for over eight hours before I was unlawfully arrested and not only were the agents in my case negligent (and not "diligent") they were downright malicious and guilty of outrageous conduct discussed below.

The unwarranted stopping and detention of someone to search them is not just a "search" but it is a "seizure" as well. See, e.g., *Delaware v. Prouse,* 440 U.S. 648, 653 (1979). A "seizure" takes place anytime a person is stopped and detained by authorities and not allowed to leave or at least the "reasonable person would not believe he is free to leave" which was certainly the situation in my case where I was clearly told that I was being detained for Homeland

Security. They took the keys of the airplane from me and for the better part of eight hours I was told what to do and where to sit.  I was certainly in "custody" and not "free to leave" or able to go where I wanted to go freely.  See, e.g., *United States v. Mendenhall,* 446 U.S. 544, 554 (1980).

Where there is a violation of the Fourth Amendment, all items seized and all statements made must be excluded from any trial against me because of the "fruits of the poisonous tree". See *Wong Sun v. United States,* 371 U.S. 471 (1963). It was clearly plain error to deny my motion to suppress as there is no question that my case involved an illegal stop, an unlawful detention and an unreasonable search and seizure all done without a warrant, probable cause, or any exigent circumstances. See *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (A search conducted without a warrant is per se unreasonable). And, an "unreasonable" search cannot be turned into a "reasonable" search. Based on what the government agents find that a "search unlawful at its inception may be validated by what turns up" is abhorrent to the Founders notions of the Fourth Amendment and the protection which they sought to provide. See *Wong Sun* at 484. As the Supreme Court has made clear, the purpose of the exclusionary rule is to "deter conduct" not "repair conduct". See *Elkins v. United States,* 364 U.S. 206, 210 (1960). As the Supreme Court stated in *Elkins,* "The Exclusionary Rule is calculated to prevent, not to repair. Its purpose is to deter, to compel respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." This way, when things are done wrong- as was done no less than six times in this case- the end result will be the exclusion of all evidence. For that reason alone, the Court should review my original Motion to Suppress and grant my 2255 Petition.

Cases in the Eighth Circuit have also followed these Supreme Court precedents religiously and have adhered to these strict guidelines. For example in *United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998), the court found the traffic stop of Beck and asking to see his license and registration was perfectly acceptable, just as I showed my license and medical certificate to the officer when asked. However, what was not acceptable was to have Beck wait for another officer to come so their drug dog "King" could come to sniff Beck's car. That is what made the search in *Beck* "unreasonable." Beck even quotes after the police checked Beck's license and registration he should have been allowed to leave, just as I should have not been detained and I should have been allowed to leave. As the Eighth Circuit pointed out, the test for an "unreasonable stop, detention, and search is if a reasonable person would not believe he is free to leave". Citing *United States v. Hathcock,* 103 F.3d at 718 (8th Cir. 1997), and *United States v. McKines,* 933 F.2d 1412, 1449 (8th Cir. 1991), which both refer to *Mendenhall,* 446 U.S. at 554.

Certainly that was exactly the case in my situation starting at 11:15 am when I was told that I was to be detained by Sergeant See until Homeland Security got to the airport. Furthermore, if I was really being tracked all night for suspicious activity, which the government falsely alleged, the FAA and air traffic control had the authority to command me to land at any point in time at any airport. And woe to the pilot who refuses to land when ordered to do so by the FAA or air traffic control, as they will be intercepted by two F-16s fighter jets immediately. The FAA or air traffic control could have ordered to have me detained at Greeley, Colorado where I refueled and/or at Imperial, Nebraska where I took an hour and forty minute rest and bathroom break, if I was truly being tracked for suspicious flight activity. It is probably closer to the truth that when the emergency landing brought me to Iowa, the local authorities decided to stop me and then tried to fabricate "reasonableness and probable cause" by making up a phony

tracking story because there's absolutely nothing about "tracking" me in the FAA agent reports, and query would that tracking be legal after the decision in *United States v. Jones,* 565 U.S. 132 (2012). But, even assuming there was legal tracking of my flight going on, and even assuming that it was legal to ask for my pilot's license and medical certificate it was clearly unlawful to detain me for that long a time and then search the plane without probable cause, a warrant or without my consent. In fact, the Eighth Circuit has even ruled that "giving consent did not and cannot purge the taint of an illegal stop and unlawful seizure". See *United States v. Yousif,* 308 F.3d 820 (8th Cir. 2002).

In *Yousif,* a family was stopped at a traffic stop and after being detained were told that they could either consent to a search or wait until the unit with a drug dog would come and then they would not have to give permission. Based on the theory that a drug dog sniffing on the outside of the car did not constitute a Fourth Amendment "search or seizure" and if a drug dog alerted then a legal search could proceed without a warrant. See e.g., *United States v. $404,909,* 182 F.3d 643, 647 (1999). This is based on the premise that an automobile outside has a reduced expectation of privacy, which cannot be said of luggage or the double locked footlocker in *Chadwick* or the duffel bags in my case which would require a search warrant to inspect and search.

While it is true, that unlike my case where I never gave my consent to search, that *Yousif* eventually did consent, though begrudgingly so, and of course the police found 100 kilos of marijuana, *Yousif* pled guilty. He was sentenced to 37 months for 100 kilos which is five times the amount which was found in the plane in my case. That should, at the very least, mandate a reduction in my current sentence to time served. In *Yousif,* the Eighth Circuit vacated his conviction and sentence because the beleaguered consent did not purge the taint of an illegal stop

and unlawful seizure citing among other cases *Brown v. Illinois,* 422 U.S. 590 (1975), and states that the District Court erred in denying Yousif's motion to suppress.

The reason that *Brown* is important to my case is because in it the Supreme Court strongly reaffirms the use of the exclusionary rule to block all evidence and statements that are the "fruit of the poisonous tree" as described in the Supreme Court's decision in *Wong Sun v. United States,* 371 U.S. 471, 486 (1963). In *Brown,* there was an illegal arrest and unlawful search that the Supreme Court said the later Miranda warnings could not cure the unlawful arrest without probable cause or the unlawful search without a warrant, and no amount of Miranda warnings (there were several) could "purge the taint" of the unlawful arrest and unlawful search." See *Brown* at 603-605.

In my case, Your Honor has already ruled that the earlier Miranda warnings allegedly given in my case were inadequate. Moreover, both *Brown* and *Wong Sun* stand for the principle that once an illegal search or an illegal stop has occurred the "taint" of the illegal stop, arrest, or search cannot be purged with the later giving of Miranda warnings after the fact - and all evidence found would be excluded as "fruits of the poisonous tree" just as was done in *Yousif.* In my case, however, not only was there no probable cause for the unlawful stop, arrest or detention, there was also no consent to search and no Miranda warnings given at all. This can be confirmed from a review of the time line in this case.

As Your Honor will recall, Sergeant See confronts me in the hangar just after 11:00 am while I am working on the engine repairs with a mechanic. He asks me for my pilot's license and medical certificate. I even showed him my driver's license for proper photo identification. Under the Eighth Circuit's decision in *Beck* that should have been the end of the "stop" and the interrogation. But, Sergeant See then called someone on his radio, and said that I was to be

detained until Homeland Security could get there from Cedar Rapids. This was the start of an

unlawful stop, detention, and arrest as determined by the Supreme Court in *Brown, Delaware v.*

*Prouse,* 440 U.S. 648,653 (1979), *Brendlin v. California*, 551 U.S. 249 (2007), and the Eighth

Circuit in *Yousif.*

While I was talking to Sergeant See, the mechanic proceeded to finish up the repairs on

the plane and towed the plane out to the middle of the tarmac for my immediate departure once I

was done with Sergeant See. But since I was not free to leave and I was being unlawfully

detained without a warrant or probable cause, this was a classic unlawful stop. See *Mapp v.*

*Ohio*, 367 U.S. 643 (1961). As Your Honor concludes in Your Honor's opinion, I was detained

and under arrest as of 12:35 am. I believe that I was under arrest earlier at 11:15 am, when

Sergeant See said that I was being detained and Homeland Security was on their way. See Doc

78 page 7, and *Delaware v. Prouse* at 653.

As Your Honor will also recall, Ultro was brought out to the middle of the tarmac to sniff

the airtight plane in 50 mile per hour winds (see enclosed as an exhibit the weather reports for

that day for Washington County Airport provided by NOAA) in 6 degree Fahrenheit below

freezing temperatures at 12:25 pm. At 12:35 pm, Ultro allegedly alerts. The reason that did not

happen - aside from the physical impossibility aspects of that remarkable feat described

elsewhere - is that if Ultro actually did alert, there would be no reason to forge my signature on

the Miranda form and the Consent to Search form at 4:19 pm and 4:20 pm later that same day.

We now know that not only is my signature not on those forms, but that it was either

Agent Allen or Agent David Hoagland that more than likely was the forger. The reason that we

know that Ultro did not really alert, is because there would have been no reason to wait four

hours to discuss Miranda forms or Consent to Search forms at 4:20 pm, after I had been refusing

to allow the search all day and no reason to wait to search the airplane until 6:50 pm. Similarly, we know those forms are forged because of the handwriting expert and because there would be no reason to wait another two hours to threaten to break into the plane. If I had "freely" given my consent to search the plane at 4:20 pm why threaten to break into the plane at 6:45 pm?

Importantly, they brought the plane back into the hangar; they had the keys all afternoon, and did not search the plane despite Ultro's alleged alert at 12:35 pm and my alleged consent to search at 4:20 pm. Just as in *Brown,* my unlawful stop and detention by Sergeant See was an unlawful "seizure" that no amount of Miranda warnings can purge the taint of the unlawful stop and the unlawful seizure and detention. *Brown* is not just based on the Supreme Court's decision in Miranda (See *Miranda v. Arizona,* 384 U.S. 436 (1966)), but two other cases as well, *Mathis v. United States,* 391 U.S. 1 (1968) and *Orozco v. Texas,* 394 U.S. 324 (1969). In *Mathis,* the law enforcement official was an IRS agent auditing Mathis, and it was deemed that the IRS agent should have Mirandized Mathis before talking to him. In my case, Sergeant See was clearly a member of "law enforcement" as he was in uniform and had his hand on his gun the entire time he talked to me about detaining me for Homeland Security. I clearly understood that Sergeant See was detaining me and that I was not free to leave.

In *Orozco,* the accused was confronted in his bed and asked questions by police officers at his boarding house at 4:00 am in the morning. From the time that the four officers entered Orozco's bedroom, he was told that he was not "free to go where he pleased" but was instead "under arrest" and they continued to ask him questions without giving him any Miranda warnings. The Supreme Court in its decision in *Orozco* concluded:

> "But the opinion [Miranda] iterated and reiterated the absolute necessity for officers interrogating people "in custody" to give the described warnings. See *Mathis.* According to the officer's testimony petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The Miranda opinion

declared that the warnings were required when the person being interrogated was 'in custody at the station or OTHERWISE DEPRIVED OF HIS FREEDOM OF ACTION SIGNIFICANT IN ANY WAY.' *Miranda* 384 U.S. at 477 (Emphasis in original)." *Orozco* at 327.

Obviously, unlike the IRS agent in *Mathis*, Sergeant See was in uniform and armed. And unlike Orozco I was not confined to my bedroom when police and Homeland Security began asking me questions. I was being detained for nine hours at a public airport. Clearly if Miranda warnings were required in *Mathis* and *Orozco*, they were clearly required in my case and Your Honor recognized that the early Miranda warnings were not done properly, if they were done at all, and now that we have proof that either Agent Allen or Agent Hoagland forged my signature on a Miranda form that I never saw, Your Honor has no choice but to vacate my conviction for this oversight and forgery. But, even assuming that I did sign the Miranda form (which I clearly did not) and Consent to Search form at 4:20 pm as the agents allege, *Brown* and *Yousif* stand for the proposition that "giving consent did not and cannot purge the taint of an illegal stop and unlawful seizure." See *Yousif,* 308 F.3d 820, 825 (8th Cir. 2002).

Moreover, *Orozco* requires that Miranda warnings be given even in the case where there is no arrest and while questioning a suspect in his own bedroom because the presence of the officers means that he was "in custody" for the purposes of Miranda because he was not free to go where he wanted or leave. See *Orozco v. Texas*, 394 U.S. 324, 327 (1969). Because Sergeant See was clearly detaining me, he put me in custody immediately after checking my paperwork at 11:00 am that morning. Therefore, because I never gave my consent to the search, and because even if I did give my consent at 4:20 pm that consent would not "purge the taint" of my original stop, detention, and unlawful arrest. Thus, any evidence unlawfully seized must be excluded as "fruits of the poisonous tree" under the Supreme Court's decision in *Wong Sun v. United States,* 371 U.S. 471 (1963).

Your Honor has already ruled that I was detained and arrested by Sergeant See when Ultro alerted at 12:35 pm. Respectfully, I must tell you that several Supreme Court cases as well as Eighth Circuit precedents make it clear that I was the subject of an "illegal stop and an unlawful seizure" much earlier when Sergeant See said I was being detained at 11:15 that morning.  See, e.g., *United States v. $45,000 in US Currency*, 749 F.3d 709 (8th Cir. 2014), *citing Yousif*, 308 F.3d at 825. As such, neither consent nor Miranda warnings can "purge the taint of an illegal stop and an unlawful seizure." *Yousif*, at 825.

The Supreme Court has indeed determined that a person is "seized" by the police or law enforcement - and thus entitled to challenge the government's action under the Fourth Amendment when the officer "by means of physical force or show of authority" restrains an individual's freedom of movement. See *Brendlin v. California*, 551 U.S. 249 (2007) and *Florida v. Bostick*, 501 U.S. 429, 434 (1991) quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Thus, from the moment that Sergeant See unlawfully "seized" me and said I was being "detained" at 11:15AM, there is nothing the government could say or do to avoid the application of the Exclusionary Rule under the Supreme Court's decision in *Wong Sun* "as fruits of the poisonous tree", I know it was about 11:15AM because the phone records show that I called my wife at 11:18AM from Washington Airport to say that Sergeant See had stopped me and I was being detained by the police waiting for Homeland Security to arrive from Cedar Rapids over an hour away.

In its 8-1 decision in *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), the Supreme Court concluded that a police officer's random stop and detention of a driver to check his driver's license and vehicle registration for no good reason was held to be violative of the Fourth Amendment as an unreasonable seizure because the police officer had no articulable or

reasonable suspicion that the motorist was doing anything wrong. See *Prouse* at 653. As the

Supreme Court has stated:

> "The purpose of the Fourth Amendment is to prevent arbitrary and oppressive
> interference by enforcement officials with the privacy and personal security of
> individuals." *United States v. Martinez-Fuente*, 428 U.S. 543, 554 (1976).

Since as the Court points out in Your Honor's opinion (Doc. 78 at page 7) that Sergeant See

stated directly to me that I was being detained at 11:15 am I was clearly not free to leave, and

because I was not free to leave I was unreasonably and unlawfully "seized" under *Brendlin*,

*Prouse, Florida v. Bostick*, 501 U.S. 429, 454 (1991) and *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

In fact, the government cites in its brief (see Doc. 30) the Supreme Court's decision in

*United States v. Mendenhall*, 446 U.S. 544 (1980), which stands for the proposition that a person

is "seized" at the moment when he believes that he is not free to leave:

> "We conclude that a person has been 'seized' within the meaning of the Fourth
> Amendment if, in view of all of the circumstances surrounding the incident, a reasonable
> person would have believed he was not free to leave." *United States v Mendenhall.*, 446
> U.S. 544, 554 (1980).

Even the Court concluded that I was under arrest for the purposes of the Fourth Amendment test

of unreasonableness (see Doc 78 at pages 20-21 citing *United States v Martinez*, 462 F.3d 903

(8th Cir. 2006)). "A suspect is in custody if a reasonable person in his position would not have

felt free to terminate the interrogation and leave." See *Martinez* at 909. The record shows that

the plane was ready to go and was already out of the hangar and on the tarmac. If not for

Sergeant See with his hand on his weapon, I would have been airborne at 11:18AM instead of

calling my wife to tell her that I was being detained.

Both the government and Your Honor know that Sergeant See asked his Chief Goodman

if they should apply for a search warrant. Chief Goodman advised Sergeant See to wait for

Homeland Security to arrive. If AMOC had really been tracking me all night as the government

alleges, then after Ultro had his "positive" alert there was plenty of time to get a search warrant as required in *Chadwick* - and not done there as well - and there were clearly no exigent circumstances as the plane and I were not going anywhere courtesy of Sergeant See and the three other officers on the scene by this time.

There was no probable cause or reasonable suspicion for the stop or any detention and the government cannot manufacture probable cause after the fact. Both Sergeant See and Agent Allen asked the same question "What's going on here?" as neither one of them had a clue as to why I was stopped and what they were looking for. To that point please contrast and compare the story discussed by the government in Doc. 30 about Ultro and the alleged "alert" with the discussion in Doc. 76 where the only suspicious activity mentioned is the plastic containers I had in the cargo portion of the plane along with other survival equipment such as a tent, sleeping bag, and cold weather gear in the event that the airplane had mechanical issues and I had to do an emergency landing in some desolate location. If I was carrying extra fuel a "drug smuggler" as the government speculates - the two, five gallon plastic jugs would have maybe given me an extra 15 miles of flying time if I were able to walk out on to the wing at 200 miles per hour and pour it into the wing tank. As it was, the plastic containers were empty and still in their plastic packaging from the store. There was no flammable liquid in them, and when I opened up the cargo hold to look for the air worthiness certificate the plastic containers tumbled out and blew across the tarmac in the 50 mile per hour winds like two tumble weeds. And I might add that the containers were bright yellow and orange-red to attract rescue planes overhead if I were to crash somewhere. The government also reported that I had $6,000 in gift cards and currency and that I had already stopped in Greeley Colorado and Imperial, Nebraska to refuel and I would have easily made it to Lansing, Michigan to refuel for the final leg to Danbury, Connecticut later that

43

day. Had Sergeant See not unlawfully stopped me and seized me, I would have missed Ultro and

his miraculous ability to sniff marijuana contained in hermetically sealed bags inside an airtight

plane in 50 mile per hour winds outside in below freezing weather.

As stated by the Eighth Circuit in *Yousif* - Miranda warnings and giving consent "did not

and cannot purge the taint of an illegal stop and an unlawful seizure." *United States v. Yousif,*

308 F.3d 820, 825 (8th Cir. 2002). Moreover, there was no search warrant in this case, so the

search was "unlawful" and "unreasonable" per se. See, e.g., *Kyllo v. United States,* 533 U.S. 27,

31 (2001), and *United States v. Chadwick* 433 U.S. 1 (1977), and there is nothing that can save

this warrantless search from the Exclusionary Rule under *Wong Sun v. United States,* 371 U.S.

471 (1963) as "fruits of the poisonous tree". And as the Supreme Court stated in *Elkins v. United*

*States,* 364 U.S. 206 (1960), the purpose of the Exclusionary Rule is to deter bad conduct on the

part of the government not repair it. *Elkins* at 216.

The Court should realize that Agent Allen and Agent Hoagland lied in their reports and

lied to the Court. When Agent Allen arrives on the scene at about 1:00 pm in the afternoon he

asks if Sergeant See had "Mirandized" me, and he says that he did not. So Agent Allen tells me

that I am not in custody and not being detained. Then Agent Allen says that he read me my rights

and asked me to read the Miranda warnings form out loud. This did not happen. But Agent Allen

and I can both agree on one thing, that I refused to sign the Miranda Warnings form. See Doc. 78

at page 10.

Then after lunch at 2:00 pm nothing happens until after 4:00 pm when Agent David

Hoagland arrives on the scene. And even more incredible than Ultro's amazing nose, Agent

Hoagland finds a different Miranda form and a different Consent to Search form - and after

saying "NO" to the search of the plane for five hours, I allegedly and miraculously changed my

44

mind and supposedly sign both a new Miranda form and a new Consent to Search form. That just did not happen and someone did a bad forgery of my signature. I did not sign either of those two forms that I was never supposed to see until the FAA accidentally sent them to me.

But the best evidence that I did not sign these forms is not just the forensic handwriting expert, but rather the fact that they waited until 6:45 pm to threaten to break the windows of the plane to get in and search. I know that was precisely the time because I made my last phone call to my wife at that time and that is verified by the Verizon phone bill records. Once again I verbally stated that I refused to grant permission to search the airplane both on video and Doc. 78 at page 28. Your Honor should demand to see that video tape and then issue arrest warrants for both Agent Allen and Agent Hoagland. If the government says the video tape no longer exists then Your Honor should grant my 2255 Petition and retroactively grant my Motion to Suppress. Your Honor will recall that at 6:45 pm after threatening to break the window of the airplane, they handed me back the keys that they had had in their possession all afternoon and I looked right into the video camera to say that I was still not giving them permission to search the plane. Despite my protests not to search the plane, they searched the plane and found the marijuana just as in *Chadwick* and just as in in *Yousif*. Because it is clear that I did not give my consent to search and there was no search warrant or exigent circumstances here this was an unlawful stop, detention, search and seizure and arrest. And even assuming arguendo that I did give my permission, which I absolutely did not, the Eighth Circuit ruled in *Yousif* just as the Supreme Court ruled in *Brown v. Illinois* that the later "permission" or Miranda warnings cannot "purge the taint" of the earlier unlawful stop, arrest, detention or search. In *Yousif,* the accused begrudgingly gave his permission, but this was not enough to cure the violations of the law, and his conviction was overturned as the evidence should have been suppressed. In my case Agent

Allen or Agent Hoagland or someone else forged my name on some forms that I never saw, and for that crime that should "shock the conscience" of this Court not only should Your Honor call for my immediate release from prison while the circumstances of the forgery are investigated, Your Honor should question the prosecutors in my case to find out what they knew about the alleged consent forms and when they knew it. Your Honor was lied to by the agents and prosecutors in this case, and this should cause Your Honor to launch an investigation into the criminal acts of law enforcement in this case.

Just as the Supreme Court has ruled that a warrantless search is per se "unreasonable," see e.g. *Kyllo,* 533 U.S. at 40, and that the Exclusionary Rule is designed to "deter and prevent improper conduct" by law enforcement officials not "repair it." See, e.g., *Elkins v. United States,* 364 U.S. 206, 218 (1960), and that "a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law." *McNabb v. United States,* 318 U.S. 332, 345 (1943). Moreover, as Justice Brennan famously wrote in *United States v. Calandra,* 414 U.S. 338, 361 (1974): "The judges who developed the exclusionary rule were well aware that it embodied a judgment that it is better for some guilty persons to go free than for the police to behave in forbidden fashion." *Calandra* at 361.

The reason for this is that the Fourth Amendment forbids ALL "unreasonable searches" and it protects all, "those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made and the papers taken." See *Gouled v. United States,* 255 U.S. 298, 307 (1921).

The second part of the Fourth Amendment states "and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and with particularity of the persons or things

to be seized." This is meant to prevent the specific evil that the Founders abhorred known as the "general warrant" which allowed a general exploratory rummaging through a person's belongings. See *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). In fact, the premise in *Coolidge* was that ANY intrusion in the way of search and seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. (Emphasis in original, see *Coolidge* at 467, *citing McDonald v. United States*, 335 U.S. 451 (1948)).

A valid search warrant would be necessary for any search and seizure in order to prevent such "general exploratory rummaging in a person's belongings" and the attendant privacy violations. *See Coolidge* at 467. Similarly, the requirement of a warrant before any search or seizure could be commenced even at an airport or after the luggage was put into a cab was because the Founders wanted to prevent all invasive intrusions into a citizen's privacy unless there were truly exigent circumstances, because all such intrusions were evil. The reason for this is because as the Supreme Court described:

> "Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the Constitutions or statutes of every state in the Union. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." See *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

So the twin evils that the Fourth Amendment was designed to prevent were an unlawful and unreasonable violation of a person's expectation of privacy and any type of a search or a seizure without a warrant. Both of these evils abhorred by the Founders occurred in my case. The word "evil" here is not too strong. For example in *United States v. Galpin*, 720 F.3d 436, 455 (2d Cir. 2013) states:

> "The chief evil that prompted the framing and adoption of the Fourth Amendment was the indiscriminate searches and seizures conducted by the British under the authority of general warrants." Citing *Payton v. New York*, 455 U.S. 573, 583 (1980).

Similarly as was stated by the Supreme Court in *Arizona v. Gant,* 556 U.S. 332, 345 (2009):

> "The central concern underlying the Fourth Amendment is the concern about giving
> police officers unbridled discretion to rummage at will among a person's private effects."
> *Arizona v. Gant*, 556 U.S. 332, 345 (2009).

There clearly were no "exigent circumstances" in my case, because Sergeant See detained me at

11:15 am and took the keys to the plane at 12:35 pm after Ultro's alleged positive alert. Just as

the Supreme Court required the federal agents in *Chadwick* in 1977 to get a warrant before

opening the footlocker after the arrest and detention at the Boston Federal Building, so, too, did

the Supreme Court two years later rule that a warrant was necessary to inspect the luggage

coming off a plane in Little Rock, Arkansas. See *Arkansas v. Sanders*, 442 U.S. 753 (1979)

where police officers were tipped off that a suspect would arrive on a flight at a local airport in

Little Rock carrying a green suitcase containing marijuana. Unlike in my case where there was

no "tip" or "probable cause" the police had been tipped off by a reliable informant but instead of

getting a search warrant they waited for the suspect to get into a cab and pulled the cab over to

search the suitcase without getting anyone's permission - or even asking for permission to search,

thinking incorrectly just as the officers in *Chadwick* had done, that once the luggage was placed

in a cab it now became an "automobile" stop. Needless to say, the Supreme Court almost seems

irate that the officers ignored their unanimous decision in *Chadwick* two years earlier and

affirmed the reversal of Sanders' conviction by the Arkansas Supreme Court which stated that

Sanders' Motion to Suppress the unlawful search of the suitcase should have been granted. Please

note that in both *Chadwick* and *Sanders* the accused had reached his planned destination, in both

cases there had been some sort of "tip" involving suspicious activity and in both cases the law

enforcement officials waited until the luggage was taken off the train or the plane to then be

arrested while they were "getting away" in an automobile and the Supreme Court affirmed the lower appellate court findings that the warrantless search and seizure was unlawful.

In my case, I was unlawfully stopped, unlawfully detained, unlawfully seized and interrogated, and there were no exigent circumstances because neither I nor the plane was going anywhere. I never consented to the search of the plane. The reason that Agents Hoagland and Allen had to forge my signature on the Miranda Form and the Consent to Search Form, that I never saw before the FAA sent them to me, is because they realized some days later that they had committed an illegal search and seizure without having any probable cause or exigent circumstances so they had to make up the improbable story that I had refused to allow the search of the plane all day and then within 20 minutes of Agent Hoagland's arrival at 4:00 pm I signed both forms without any hesitation. It is much more likely that Agent Hoagland was dispatched from Cedar Rapids to bring the search warrant but he could not obtain a search warrant from any magistrate without probable cause, so he arrived at the airport at 4:00 pm empty-handed and had to make do with forging my signature on the two forms several days later, because no other conclusion makes any sense considering the time line that they threatened to smash the windows at 6:45 pm and asked once again for permission to search the plane which I again denied them on videotape at 7:00 pm when they begin to search the plane. Once again, Your Honor should ask for a copy of that videotape and then have Agents Hoagland and Allen arrested for their despicable and illegal conduct in this case.

To be sure there was no excuse in this case for not getting a warrant. They had plenty of time if Your Honor truly believes the lie that AMOC was "tracking" me all night and that Sergeant See was detaining me for Homeland Security. Remember even Sergeant See asked his Chief if they should get a search warrant, and the Chief said to wait for Homeland Security to

arrive. Perhaps that meant that Agent Hoagland was supposed to bring the warrant with him from Cedar Rapids. There is no exception to the necessity to have a search warrant in the situation that I was in - even in the case of murder. See the Supreme Court's decision in *Mincey v. Arizona,* 437 U.S. 385 (1978), overturning the conviction of a homicide suspect (among other things that he allegedly did) because the Supreme Court did not agree with the Arizona Supreme Court in finding a "homicide" or "murder scene exemption" to the Fourth Amendment.

In concluding that the suspect's apartment should not have been searched without a warrant and the statements made from his hospital bed were not voluntarily given Justice Stewart wrote an opinion for a unanimous court that the warrantless search of Rufus Mincey's apartment was not constitutionally permissible simply because a murder had occurred there and that it was not up to the police officers to decide whether it was reasonable to search the premises but rather it was up to an objective magistrate:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Mincey* at 395

The absolute prohibition against a warrantless search in a case like mine where no consent was given - and even assuming arguendo that it was given that later consent cannot "purge the taint" of the earlier unlawful stop and seizure (See *Youssef* and *Brown v. Illinois*) can be seen in the Supreme Court's 1982 decision in *United States v. Ross*, 456 U.S. 798 (1982) where both *Sanders and Chadwick* are repeatedly mentioned:

> "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search

of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab. See *Ross* at 824.

The essence of the Supreme Court's decisions in *Chadwick, Sanders, and Ross* is that it does not matter whether the suitcase or duffel bag is in a train, an airplane, or in a cab (or an automobile for that matter), it is the footlocker in *Chadwick* or the green suitcase in *Sanders* that is sacrosanct and not to be violated without a valid warrant. The duffel bags and suitcase in the locked airplane in my case were zipped shut and padlocked and strapped to the floor of the passenger compartment of the plane as opposed to the trunk of a cab. (See *Ross* and *Sanders* above.) Clearly there can be a greater expectation of privacy for duffel bags and a suitcase in a locked airplane in my case than the footlocker transferred to the car in *Chadwick* or the suitcase transferred to a cab in Sanders. It is important to note that in both *Chadwick* and *Sanders* - the lower courts' granting of the suppression of evidence in each case was upheld by the Supreme Court in virtually unanimous decisions. These decisions validate the full force and effect of the Fourth Amendment's protections for American Citizens from the "evils" of a warrantless search.

Therefore, even assuming that the government was desperately trying to come up with some story or "probable cause" after the fact to explain away their illegal actions, there is nothing that could excuse their illegal and unlawful conduct and nothing they could do or say that could cure or "purge the taint" of their unlawful or unreasonable conduct. Instead they compounded their unlawful conduct by forging my signature on forms that I never saw before and by lying to Your Honor about the true facts of my illegal arrest, detention, interrogation and the search and seizure all of which was done in clear violation of my constitutional rights.

Finally, I can find no better description of the violation of both my Fourth Amendment rights as well as my Fifth Amendment rights in this case than Justice Brandeis in his dissent in

*Olmstead v. United States*, 277 U.S. 438, 485 (1928), where he describes the inter-relationships

between the Fourth and Fifth Amendments in this case:

> "Unjustified search and seizure violates the Fourth Amendment whatever the character of the paper; whether the paper when taken by the federal officers was in the home, in an office, or elsewhere; whether the taking was effected by force, by fraud, or in the orderly process of a court's procedure. From these decisions, it follows necessarily that the Amendment is violated by the officer's reading the paper without a physical seizure, without his even touching it, and that use, in any criminal proceeding, of the contents of the paper so examined -- as where they are testified to by a federal officer who thus saw the document, or where, through knowledge so obtained, a copy has been procured elsewhere -- any such use constitutes a violation of the Fifth Amendment. The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings, and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone -- the most comprehensive of rights, and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." *Olmstead v. United States*, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).

Therefore, if the stops, detentions, and searches in *Beck* and *Yousif* were unlawful, then

clearly the stop, detention, search and seizure in my case was also unconstitutional and my 2255

Petition should be granted and my conviction and sentence both vacated.

## VI.   MY CONVICTION MUST BE VACATED AND MY INDICTMENT DISMISSED FOR GOVERNMENT MISCONDUCT THAT SHOULD "SHOCK THE CONSCIENCE" OF THIS COURT

The first time that I ever saw the Miranda Warnings Form or the Consent to Search Form,

that Your Honor based your decision on that I gave my consent to search the airplane, was when

my wife sent me that FAA case against me last month to strip me of my pilot's licenses. I did not

see these forms even though the government included them as Exhibits 9, 11, and 12 (I deduce

that from Your Honor's opinion) because no one ever showed me the government's submissions

while I was incarcerated in Iowa. It was only here at USP Canaan that I saw these documents for the first time. The signatures on the forms are clearly not mine. My wife has hired one of the leading forensic handwriting experts in the country to ascertain that fact, but I have included for the ease of Your Honor's perusal, copies of the forged documents that I have received from the FAA in their package to me as exhibits along with documents that I have actually signed such as my Driver's License and Social Security Card.

Not only do these forged documents prove that my stop, detention, arrest, and search and seizure were all unlawful, but conduct like this by law enforcement officials should, "Shock The Conscious" of this court, as the conduct in *Rochin v. California* shocked the conscious of the Supreme Court. *See Rochin v. California,* 342 US 165, 172 (1952).  Just as Sydney Powell has described shocking conduct by prosecutors in the Enron Barge case in her recent book, "Licensed To Lie" and the conduct of prosecutors in the Senator Ted Stevens case led to rebuke of the prosecutors by the Justice Department, in neither of these two notorious cases did law enforcement officials or government investigators forge critical documents. I never gave my permission to search the airplane, and even after the government threatened to smash the side window to gain access I looked right into the video camera to clearly state that I was not giving them permission to search the plane. Your Honor should order up a copy of that video tape if the government has not destroyed that evidence as well just to prove the case against me was all a pack of lies and my Fourth, Fifth and Sixth Amendment rights were all violated by this egregious and outrageous government misconduct.

Even assuming, arguendo, that Ultro (the sniff alert dog) was able to do the impossible, that is smell marijuana, while standing outside on an open airport tarmac in 50 mile per hour northerly sub-freezing winds, that was contained in double bagged, hermitically sealed plastic

bags with Bounce dryer sheets between layers, see FAA photo exhibit B, inside water-proof duffle bags and a suitcase all inside an airtight, water-tight aircraft, it strains all notions of credibility that Ultro had a positive hit. It is much more credible to believe that Ultro just wanted to play with his tennis ball as a reward for running around the airplane.

But, forget about the actions of the canine in this case, because it is the actions of the "law enforcement" officers in this case that speak volumes as to the truth of the matter. To refresh Your Honor's memory of the timeline in this case, I was approached by Officer See just after 11 AM on the morning of February 19, 2013. He then asked for my pilot's license and medical certificate. After I showed him these documents that should have been the end of the "stop" for air-traffic control purposes. Instead Officer See explained to me that I am to be detained until Homeland Security can arrive and they were en route from Cedar Rapids slightly over an hour away. This "detention" was clearly unlawful by both Eighth Circuit standards and Supreme Court standards and hopefully by the standards of Your Honor as well. See, e.g., *United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998), *United States v. Yousif,* 308 F.3d 820 (8th Cir. 2002), and *United States v. Place,* 462 U.S. 696 (1983). Also for there to be a lawful stop, detention and search without a warrant there must be much more than just "speculation". See, e.g., *Illinois v. Gates,* 462 U.S. 213 (1983).

But for the purposes of making my point; from the time that Officer See told me that I can't leave and that I was being detained by him and waiting for Homeland Security to arrive; that is an "unlawful detention" and an "unlawful seizure" as well as an "unlawful arrest" at 11:20 AM despite my technical arrest after the unlawful search at 7:30 PM that night almost eight hours after my initial stop at 11 AM had elapsed. It was the conduct of law enforcement officers that betrayed the truth of their unlawful conduct. Based on a lawful traffic stop and sniff alert by

a trained canine if Ultro really did smell marijuana in hermetically sealed bags inside a sealed

airtight airplane in a 50 Mile Per Hour howling winds the law enforcement officials would have

had probable cause to search the airplane at 12:35 PM. Instead they felt the need to attempt to get

a search warrant probably because of the *Chadwick* case discussed above which is directly on

point to this situation, and because at a traffic stop an automobile is not "airtight" or "water tight"

whereas an airplane must be both. One of the agents probably realized that it was highly unlikely

that Ultro had a positive alert, and for all I know they made up the entire story of Ultro's alert just

to coerce a confession because they took me off scene, brought me indoors and did not allow me

to watch Ultro in action. Instead they made me wait inside.

      But, what I do know is that various agents were continually calling someone on the

outside, an AUSA perhaps, to secure a search warrant for an already bungled, unlawful stop,

detention, search and seizure and then arrest. The fact of the matter is that if Ultro really did have

a positive alert at 12:35 PM there would have been no reason for me to have to sign a Miranda

Warning form and a Consent To Search form after refusing multiple times at 4:20 PM. If I really

did sign this Consent To Search form at 4:20 as the agents allege on their forms provided to me

by the FAA in its package to me, then there would be no reason to threaten to break the window

to get into the plane at 6:45 PM or wait until 6:50 PM to search the plane, in fact they had the

keys to the plane the whole time and the officers handed me the keys to unlock the plane. In

retrospect I should have let them smash the plane to bits because Jack Cooper lied through his

teeth at my forfeiture hearing, because if there was any damage to his airplane whatsoever how

did he fly it back to New York, a five hour flight just after a simple oil change with no work on

the engines or airframe. But it appears from the agent reports sent to me by the FAA that no one

told the truth in my case so why should I be surprised that Jack Cooper lied as well for his own

benefit and profit at my expense? He probably made a deal with the agents to have his airplane returned to him instead of being seized.

In any event it is impossible for the dog to have made a positive alert of anything stored in an airtight aircraft in 50 mile per hour sub-freezing winds at 12:35 PM because the search would not have been delayed until 7 PM. I never signed a Consent To Search Form or the Miranda Warning Form at 4:20 PM because there would have been no reason to do so. There would have been no reason to threaten to smash the window at 6:45 PM and there would have been no reason for me to stand in front of the camera and say that I refuse to give my permission to have the plane searched as Your Honor notes twice in your decision on my Motion to Suppress.

Once again, Your Honor should demand to see a copy of the video tape and ask why I would be refusing the search at 7 PM if I had already signed permission forms at 4:20 PM. Clearly the forms are forgeries, fabricated after the fact, and only used for the government's exhibits and for my FAA hearing. Moreover, if not for the FAA sending these forged documents to me I would have never seen them at all and this outrageous conduct on the part of the "law enforcement" officers would have gone undetected. Now that Your Honor knows the truth, I respectfully request that you grant my 2255 petition ordering my immediate release from prison, vacate my conviction and sentence and dismiss my Indictment with prejudice as the Supreme Court suggested was the ultimate sanction for government misconduct in *United States v. Russell,* 411 U.S. 423, 435 (1973). Then, after that, I humbly request that Your Honor order a full investigation to learn who forged the forms and what other egregious and unconscionable acts performed by "law enforcement" against me in my case. Your Honor, I also grew up believing "law enforcement" officials were sworn to uphold the Constitution and the laws of the

United States, and now much to my chagrin I find that is far from the truth. Instead the "law enforcement" officials in this case violated my Fifth Amendment rights to Due Process "by violating the fundamental fairness, shocking to the universal sense of justice that is mandated by the Due Process clause of the Fifth Amendment". I was clearly denied my right to "fundamental fairness" in this case. See *Betts v. Brady,* 316 U.S. 455, 462 (1942).

## VII.   LACK OF AN AGREEMENT MEANS THERE WAS NO CONSPIRACY IN THIS CASE

My mother recently told my wife that my brother Michael recently filed a letter with Your Honor to ask that his sentence be reduced or that he be allowed to file an appeal due to his ineffective assistance of counsel. I have attached that email as an exhibit here because my brother states that the duffel bags and the suitcase were mine and not his. This is yet another lie but for the purposes of a conspiracy there must be a meeting of the minds and obviously there was no meeting of the minds if no one can agree on whose marijuana it actually was.  Moreover, if Michael is telling the truth (which he is not) that the marijuana is mine and not his, then there cannot be a conspiracy under the law if I was merely transporting my own marijuana.  You cannot legally have a conspiracy with only one person.  On the other hand, if Michael is lying (which he is) that means there was no agreement between the parties, nor did the government allege or prove any agreement between the parties, so therefore, as a matter of law there can be no conspiracy where as in this case there is no agreement between the parties and my conviction must be overturned.

In the Second Circuit, where I should have been tried if at all, *United States v. Gallishaw,* 428 F.2d 760 (2d Cir. 1970), quotes the Supreme Court opinion in *Ingram v. United States*, 360 U.S. 672 (1959), where it stated that: "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense

itself." 360 U.S. at 678. In Gallishaw's case, just because he provided a gun to Carballo did not mean that he was in fact, part of the conspiracy to rob the bank. In this case, other than the government's speculative conjecture, there are no facts pled in the indictment that suggest I had any intent, much less the required scienter or *mens rea* necessary for a crime, or to be part of a conspiracy to distribute drugs.

A conspiracy is an "agreement among the conspirators." *United States v. Falcone,* 311 U.S. 205, 210 (1940). A "meeting of minds" is required. *Krulewitch v. United States*, 336 U.S. 440, 448 (1949) (Jackson, J., concurring). "[U]nless at least two people commit [the act of agreeing], no one does. When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone." See *Sears v. United States,* 343 F.2d 139 (5th Cir. 1965) (no conspiracy with government informant who secretly intends to frustrate the conspiracy); *Delaney v. State*, 164 Tenn. 432, 51 S.W.2d 485 (1932) (No conspiracy with person who feigns agreement). The law of conspiracy requires agreement as to the "object" of the conspiracy. This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the "essential nature of the plan" must be shown. *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). It is never alleged that I engaged in a "meeting of minds" with anyone, and therefore the alleged agreement to, or knowledge of an agreement to conspire to possess or distribute marijuana does not exist. There certainly was no "conspiracy" to distribute marijuana in Iowa where my plane "crash landed" according to the government brief in my appeal, and now that Michael denies that the luggage and the duffle bags were not his, then you cannot have a conspiracy with just one person.

The problem of identifying the "essential nature" of the conspirators' plan often arises in cases in which "knowledge" is in issue. An examination of those cases sheds some light on the

degree of specificity that is required as to the agreement necessary to form a conspiracy. In

*Ingram*, two individuals who had assisted in the operation of a lottery that was illegal under state

law were convicted of conspiracy to evade federal wagering taxes for which their employers

were liable. The Supreme Court reversed because there had been no evidence that the individuals

knew of the tax liability. Absent such knowledge, tax evasion could not have been one of the

objectives of their conspiracy, and the convictions could not stand.

Aiding and abetting requires something more than "conspiring" to commit a crime or

thinking about committing a crime. Even knowing that a crime is being committed and being

present at the scene of a crime generally does not constitute aiding and abetting. See for example,

*Nye & Nisson v. United States*, 336 U.S. 613 (1949), where the Supreme Court quoted Judge

Learned Hand's definition of aiding and abetting in *United States v. Peoni*, 100 F.2d 401, 402 (2d

Cir. 1938): "In order to aid and abet another to commit a crime, it is necessary that a defendant in

some way associate himself with the venture, that he participate in it as in something that he

wishes to bring about, that he seeks by his own action to make it succeed." *Nye & Nissen*, at 619.

Similarly, in the Second Circuit's decision in *United States v. Garguilo*, 310 F.2d 249 (2d

Cir. 1962) the Second Circuit found that the defendant Macchia was not an aider and abettor

despite being at the print shop at the time when Garguilo and Villari were engaged in

counterfeiting ten dollar bills. Just because Macchia was Garguilo's companion did not make him

a criminal despite the fact that he had knowledge that a crime was being committed and he was

present while the crime was being committed. I lacked both the KNOWLEDGE that a crime was

being committed by Michael and his friends and being present at the SCENE of the crime, which

both the Supreme Court in *Nye & Nissen* and the Second Circuit in *Peoni* and *Garguilo* say is

NOT ENOUGH to support a claim of conspiring with or "aiding and abetting" someone in the

commission of a crime. Additionally, I had no actual knowledge that there was an alleged crime being committed.

Furthermore, in *Gallishaw*, the defendant was convicted after a trial judge charged the jury that he could be convicted of conspiracy to rob a bank if he had rented a machine gun to another individual "with the knowledge that there was a conspiracy to do something wrong and to use the gun to violate the law." *Id.* at 762. The Second Circuit reversed, saying that "at the very least" the government was required to show "that he knew that a bank was to be robbed." *Id.* at 763. They explained that the defendant "had to know what kind of criminal conduct was in fact contemplated." *Id.* at 763.  See, also, *United States v. Calabro*, 467 F.2d 973, 982 (2d Cir. 1972) (supplier of false identification must have known that it would be used in a transaction involving forged bonds in order to be guilty as an aider and abettor; generalized suspicion of illegal use would not suffice). Thus, it is clear that a general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan.

Proof of the essential nature of the plan is required because "the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964). The importance of making this determination cannot be overstated: "[a]greement is the essential evil at which the crime of conspiracy is directed" and it "remains the essential element of the crime." *Lannelli v. United States*, 420 U.S. 770, 777 n. 10 (1975). "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." *Peoni*, 100 F.2d at 403. A conspirator's liability for substantive crimes committed by his co-conspirators depends on whether the crimes were committed "in furtherance of the unlawful agreement or conspiracy." *Pinkerton v. United States*, 328 U.S. 640, 645 (1946). Similarly, the

60

admissibility against a defendant of a co-conspirator's declaration depends on whether the declaration was made "during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). This determination can be made only after the scope of the agreement has been defined. The question of whether single or multiple conspiracies have been pled or proved depends on the nature of the agreement. *United States v. Dardi,* 330 F.2d 316, 327 (2d Cir. 1964). Because overt acts are acts "to effect the object of the conspiracy," 18 U.S.C. Sec. 371 (emphasis added), they are defined by reference to the conspiratorial agreement. *United States v. Bayer,* 331 U.S. 532, 542 (1947). In addition, when questions arise concerning matters such as venue, *Hyde v. United States,* 225 U.S. 347 (1912), or the statute of limitations, *Grunewald v. United States,* 353 U.S. 391, 396-97 (1957), which depend on the formation of the agreement or the occurrence of overt acts, it becomes "crucial," *id.* at 397, to determine the scope of the conspiratorial agreement. See *Bridges v. United States,* 346 U.S. 209, 224 (1953) (statute of limitations). Therefore, since I at all times, including at my sentencing, denied being involved with my brother Michael as part of any conspiracy to possess and distribute drugs, and since the government has not proven that any such conspiracy or "agreement" or "meeting of the minds" existed, I respectfully request that this Honorable Court grant my 2255 petition, vacate my conviction and sentence, and order my immediate release from prison.

## VIII.  FORFEITURES AND OTHER SENTENCING ERRORS

As part of my 2255 petition, I would respectfully request that Your Honor reconsider the forfeitures and restitution in my case and at the very least reduce my sentence to the 24 months that my brother Michael received as he was actually the "con man" that duped me, rather than vice versa. I know that Your Honor believes that the $5,000 in restitution seems like a small amount based on the $17,000 in bills that Mr. Cooper submitted to the government for my

hearing on forfeitures and restitution. But because Mr. Cooper lied to the Court, I believe he should be stripped of any restitution, since he blatantly lied to the court and to the government and tried to "pull a fast one" all at my expense.

All of the $17,000 of repairs that the government submitted in their opposition brief to my appeal in the Eighth Circuit were done in New York. The only thing that Mr. Cooper did in Iowa was change the oil and replace a defective oil filter that caused the engine malfunction that caused my "hard landing" as the government refers to it, in Iowa, a place I had never been to before. Despite Mr. Cooper's false billing to the government, he spent roughly $250 in Iowa and flew the allegedly "un-airworthy" airplane five hours back to New York to Westchester County Airport. If the plane was as truly in as bad shape as Mr. Cooper alleged to the government and the Court, then he was fool-hearty and culpable of breaking the law as knowingly flying an unsafe aircraft anywhere is against the law. The truth is that Mr. Cooper is entitled to no restitution as an oil change is normal wear and tear on a leased aircraft, and he certainly should not be awarded anything for making a false claim to the government and trying to pull the wool over the Court's eyes.

Similarly, the only plane used to allegedly transport marijuana was Mr. Cooper's plane. If his plane was not seized under forfeiture provisions of 18 U.S.C. §981(a)(2)(A) because it was used in the commission of a crime; then my planes which were never involved and were not paid for with drug money should not have been seized. Certainly, it was patently unlawful to seize my wife's one year old car because that was paid for with her own money from an insurance settlement and was never used in any crime. Moreover, if the government is trying to seize my two planes and my wife's car based on 18 U.S.C. §981(a)(2)(B)-Provision B- the amount of forfeitures would be limited to the "Profits" I received from the illegal transaction. See, e.g.

*United States v. Santos,* 553 U.S. 507, 512(2008) (defining "Proceeds" from illegal activity as "Profits" instead of gross "Receipts" ). In my case, the distinction is meaningless because I was never paid anything by Michael for transporting his duffel bags and luggage back to Danbury Connecticut from California. Therefore, it was grossly inappropriate and unlawful to seize my wife's car and my two planes. A forfeiture or criminal penalty of this magnitude also offends the Eighth Amendment. See, e.g., *United States v. Bajakajian,* 524 U.S. 321 (1998) (Forfeiture of $342,000 deemed to violate the Eighth Amendment and to be unconstitutional for failure to disclose more than $10,000 in currency on customs form given to international airline passengers).

A forfeiture of nearly $500,000 on a plane trip that may have netted $15,000 for transporting 50 pounds of marijuana with a value of (maybe) $50,000 is grossly disproportionate to the gravity of the offense under *Bajakajian* and the other cases dealing with forfeiture and the Eighth Amendment and legal fines and forfeitures. Moreover, the holding in *Bajakajian* has been codified and extended to all forfeiture cases by 18 U.S.C. §983(g). So for those reasons, the Court should review and amend its previous decisions on both restitution and forfeitures.

Since the most I would have allegedly received would be $300 a pound or $15,000 for helping Michael, it is unconstitutionally disproportionate to steal $500,000 in aircraft and aviation equipment from me and a $30,000 automobile from my wife, who had nothing to do with and had no knowledge of any of this. I asked both of my attorneys, Attorney Helphrey and Attorney Lane to get back all of the avionic equipment, tools and other items listed paid for by me and the automobile paid for by my wife, and both of these attorneys ignored me and never submitted any of my detailed lists even though none of these items appeared on the government's forfeiture request in the indictment. How would Your Honor feel if Your Honor's

brand new car was seized by the government because of a mistake made by Your Honor's husband? It is certainly not fair to my disabled wife to have to deal with this major inconvenience and financial hit in addition to the burden of raising our daughter alone and trying to survive on food stamps thanks to my incarceration.

Finally it makes no sense to anyone that my brother Michael, who went to trial and had my own father and his friends lie on his behalf, received 24 months while I, who was the victim of both egregious government misconduct and grossly ineffective "assistance" of counsel received 57 months for taking what I thought was an "open plea" that preserved all of my rights to appeal the Constitutional violations in my case. As I sit here in Canaan prison, I am a sadder but legally wiser man. For the disparity in our sentences alone, the Court should grant my 2255 Petition, order my immediate release from prison, vacate my conviction and sentence and get me home to my disabled wife and special needs daughter immediately.

Respectfully Submitted,

/s/ Angelo Efthimiatos

_____

Angelo Efthimiatos
Reg. No. 13900-030
USP Canaan
P.O. Box 200
Waymart, PA  18472